UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Case No.

DOMINIC V. DiMODICA,

      Plaintiff,

  vs.

ROBERT MURPHY, AND
KATHLEEN DENNEHY, And
THE MASSACHUSETTS DEPARTMENT OF CORRECTION,
      Defendants.

## COMPLAINT

### INTRODUCTION

1.  The plaintiff Dominic V. DiModica is a person who is
disabled by mental retardation, and who has been civilly committed
as a sexually dangerous person, pursuant G.L. c. 123A, but has
never been provided with effective treatment appropriate to his
level of mental functions, and has been subjected to rape and continuous
sexual abuse with the full knowledge of the defendants and their
predecessors in office.  Mr. DiModica is being held in conditions
which are more restrictive than most prisons in Massachusetts,
and in conditions which are far more restrictive than necessary
for a man of his disability.  The defendants are Robert Murphy
the Superintendent of the Nemansket Correctional Center, where
Mr. DiModica has been held for over twenty years, and Kathleen
Dennehy the Commissioner of the Massachusetts Department of
Correction.  Mr. DiModica brings this action pursuant to the
Americans With Disabilities Act for prospective injunctive relief,
and purusant to 42 U.S.C. § 1983 for damages and injunctive
relief for violation of his civil rights including the Fourteenth
Amendment to the United States Constitution.

JURISDICTION

2. This court has jurisdiction of the subject matter of
this case under 28 U.S.C. §§ 1343 and 1347, including pendent
and supplemental jurisdiction over claims under the Massachusetts
General Laws, which claims are so related to the claims under
§ 1343, that they form part of the same case or controversy.

PARTIES

3. The plaintiff, Dominic V. DiModica, is a natural person,
who resides at the Nemansket Correctional Center, 30 Administration
Road, Bridgewater, Plymouth County, Massachusetts.

4. The defendant, Robert Murphy, is a natural person,
who is the Superintendent of the Nemansket Correctional Center
at 30 Administration Road, Bridgewater, Plymouth County, Massa-
chusetts. Superintendent Murphy is sued in both his individual
and official capacity.

5. The defendant, Kathleen Dennehy, is a natural person,
who is the Commissioner of the Massachusetts Department of Correc-
tion, with its principal office at 50 Maple Street, Milford,
Worcester County, Massachusetts. Commissioner Dennehy is sued
in both her individual and official capacity.

6. The Massachusetts Department of Correction of the Executive
Office of Public Safety has its principle place of business
at 50 Maple Street, Milford, Worcester County, Massachusetts.
The Department of Correction (DOC) is sued in its official
capacity only, and the plaintiff seeks only prospective injunctive
relief against the DOC.

7. All of the defendants have acted at all times relevant
to this action under color of state law.

STATEMENT OF FACTS

8.   The plaintiff Dominic V. DiModica was born in Boston on September 14, 1950.  He is now 54 years old.

9.   In 1965 Mr. DiModica was diagnosed with "Primary Simple Oligophrena with physical degeneration," a term which literally means "feeble minded."  (See page 5 of the Report of Psychological and Sexual Evaluation of Domenic (sic) DiModica by Barbara K. Schwartz, Ph.D., dated August 2004, a copy of which is attached as Exhibit 1 of this complaint.)  Mr. Modica was also treated as child for failure to grow and abnormal physical immaturity. Id.

10.   Mr. DiModica was committed to the Massachusetts Treatment Center (which the legislature renamed as the Nemansket Correctional Center subsequently) in 1972, thirty three years ago.

11.   Even before he was committed to the Treatment Center an evaluation by Joseph Petrelli and Nicholas Groth, Ph.D. of the Treatment Center observed that:

> Beyond an obvious physiological abnormality (Mr. DiModica
> has the appearence of a preadolescent), the most impressive
> feature of this patient is his mild mental retardation.
> Patient's thought process is limited to the most concrete/
> tangible aspects of existence; he also experiences considerable
> confusion over time and chronological order of events.
> The sublte nuances and cues of social conventions apear
> to totally excape him, and he appears to be able to entertain
> highly inconsistent thoughts with only minimal dissonance.
> Patient clearly does not appreciate the nature of his obser-
> vation or the possible implications of his commitment to
> this institution.  Rather he tends to depend exclusively
> on those he perceives as being in authority to determine
> what the future might hold for him.  The patient does not
> appear to be amenable to the type of treatment ordinarily
> available at this Unit; a recommendation for commitment
> should be made with the knowledge that the prognosis for
> this patient is extremely guarded.

(See page 9 of Exhibit 1.)

12. Mr. DiModica's case worker from the Department of Mental Retardation made a more candid assessment when she noted that Dr. Groth of the Treatment Center did not feel that the program there could help him, but it was preferable to incarceration in a maximum security prison. (Exhibit 1, p. 9.)

13. The records of the Treatment Center reflect that the staff repeatedly stated that the Treatment Center was not an appropriate placement for Mr. DiModica. These included:

"All things considered, he is not a good candidate for the type of treatment offered at the Treatment Center and would be better served by a placement in some other unit such as state mental hospital." (R.F. Eldgerly, 1971.)

"The paitent is not responding well to out treatment plan ...he needs to be in a gentler, less punitive place where he would not brought into contact with other patients clearly inappropriate for him to be near." (W. Rafferty, 1973.)

"We should look for alternative placement facilities for Mr. DiModica." (Simth, 1975.)

"I hope alternatives for his placement can be located before the beginnings of what I sense to be a downward spiral becomes more ominous." (Smith, 1976.)

"There is no way that Dominic DiModica belongs in the Treatment Center. Presently it appears to me that more harm than good is being done to him. He is not enrolled in school, nor is he learning a viable trade. Instead, he is subjected to influences and manipulations which are anything but theraputic." (Smith, 1976.)

"Dominic appears to have fallen through the adapting stage and hopelessly seems to be succumbing to the degenerative atmosphere surrounding him." (Smith, 1977.)

"He has always been easily led at the Treatment Center, and this has led to his apparently indiscriminate sexual exploitation here." (Seghorn, 1977.)

"Mr. DiModica has been repeatedly exploited by 'father figures' he encounters within the institution." (J. Stephen Heisel, M.D., 1979.)

"I note that at the time of his commitment, it was recommended that he should be committed to a state hospital under the delinquent law rather than to the Treatment Center.  I further note that some members of the staff at the present time feel that Mr. DiModica has been deteriorating since his commitment, and that the Treatment Center is a highly imappropriate placement for him."  (R. Moore, M.D., 1979.)

"Because of his adolescent appearance and childlike behavior, Mr. DiModica has become involved with many older pedophiles at the Treatment Center.  At times he has been abused and induced into excessive and bizarre sexual activity by these patients.  Often, however, he actively sought out such contacts and exploits his sexual appeal to others.  Generally, these experiences have heightened his sexuality while reinforcing his passivity and sense of entitlement.  Although there has been a genuine efforts on the part of some residents to be of assistance, the rewards Mr. DiModica receives for maintaining maladaptive behaviors has prevented signifi- cant growth or development.  He is seen to be and is treated as a child and his behavior closely matches this perception. At times MR. DiModica has become quite frustrated and de- pressed.  He has been hospitalized once for a suicide attempt and once for having exhibited bizarre behavior."  (Progress Report, 1979.)

"Mr. DiModica would be best served in a placement other than the Treatment Center, more suitably designed to work with the mentally retarded and behaviorally disordered person.  (Seghorn, 1984.)

(See the Records of the Treatment Center and pages 9-11 of

Exhibit 1.)

    14.  During the 33 years that Mr. DiModica has been subject

to treatment at the Treatment Center, its records reflect that

he has made "minimal progress (if any) in treatment."  (See

the August 3, 2004 CAB Report,  the May 24, 1994 Annual Treatment

Review.  May 11, 2001 Annual Treatment Review.)  Despite his

level of participation, Mr. DiModica struggled to understand

important concepts as well as how the concepts apply to the

victims of his sexual offenses.  (Frederick W. Kelso, Ph.D.

and Qualified Examiner, quoting group notes of 2000 and 2001.)

15.  The one bright spot in Mr. DiModica's treatment records was in 2001 and 2002 when his participation in treatment increased significantly and it was reported that he made "excellent progress in his evolving understanding of his sexual offenses and factors which contributed to them.  He has maintained perfect attendance in his Primary Group and integrates what he is learing in his psycho-educational course, "Clear Thinking About Sexual Assault," and a previous course, "Living in the Community," with the work he is doing in Primary Group."  (CART Report of November 27, 2001 and Exhibit 1, p. 11.)  This was attributed to the use of a different theraputic method, Dialectical Behavioral Therapy.  Id.

16.  Mr. DiModica's treatment progress ended when the Dialectical Behavioral Therapist left the Treatment Center in 2002.  Since that time Mr. DiModica has made no progress in treatment and did not appear to have permenantly integrated what he had learned in Dialectical Behavioral Therapy.  (Annual Treatment Reviews of 2002, 2003 and 2004; Exhibit 1, pp. 11-12.)

17.  The most recent evaluation of Mr. Dimodica finds that he is mildly retarded with an I.Q. of 56, which leaves him unable to maintain employment, mangage his money, sustain an independent living arrangement, or engage in appropriate social/ interpersonal functioning or self direction.  (Exhibit 1, pp. 12 and 14.)

18.  In the opinion of Dr. Barbara Schwartz Mr. DiModica is "not intellectually capable of engaging in the treatment

offered at the Treatment Center." (Exhibit 1, p. 15.)   And
he "may well be suffering from Post-Traumatic Stress Disorder
from his multiple sexual victimizations."   Id.

19.   In thirty-three years of commitment to the Treatment
Center Mr. DiModica has received at most one year of treatment
geared to his functional level.

20.   Mr. DiModica contines to be a target of sexual abuse
by other residents at the Treatment Center, which is doing nothing
effective to prevent this.   (Exhibit 1, p. 16.)

21.   The defendants continue to keep Mr. DiModica in a
prison where his only possible sexual outlets are masturbation
and sex with other male prisoners.

22.   The defendants continue to stigmatize and sanction
any sex that Mr. DiModica has with other maile prisoners.

23.   The end result of Mr. DiModica's 33 years of imprisonment
is that it has taught him that sex with other male prisoners
can be very rewarding, both sexually and otherwise, while at
the same time teaching him to conduct his sex life in secret
and actively denying it.   The so called treatment which he received
was aimed at an intellectual level far above his ability to
comprehend.   All of the treatment which he received before 1992
is now generally acknowledged to be ineffective even for persons
of normal intelligence.

24.   The conditions of Mr. DiModica's imprisonment, combined
with the lack of appropriate or effective treatment, which the
defendants continue, has affirmatively and needlessly worsened
Mr. DiModica's mental condition with the result that defendants

or their agents or employees continue to urge his indefinite

commitment to the Nemansket Correctional Center.

25.    The defendants are holding the plaintiff in conditions

of confinement which far exceed the least restrictive alternative,

and which are substantially more restrictive and punitive than

most of the prisons run by the Massachusetts Department of

Correction, including other level four prisons which incarcerate

sex offenders, such as M.C.I. Norfolk and N.C.C.I. Gardner.

26.    The defendants subject Mr. DiModica to almost all

of the same punitive regulations as apply to all other prisons

of the DOC.

27.    At other level four prisons the prisoners have greater

access to the library, the yard, the gym, the visiting room.

The yards are bigger and have substantially more amenities,

including soft ball fields, soccer fields, benchs, picnic tables,

bleachers, work out bars, flower gardens or vegetable gardens

which the prisoners are allowed grow.  The gyms have more recreational

and exercise equipment.

28.    Mr. DiModica's mother and father stopped visiting

him after the Treatment Center staff strip searched Mr. DiModica's

father before allowing him to visit.

29.    Other level four prisons such as M.C.I. Norfolk have

a greater variety of foods offered for sale in their canteen,

and offer the prisoners much greater access to cooking facilities

on their units.

30.    The defendants have failed to make a reasonable accomo-

dation to Mr. DiModica's handicap by offering educational and

recreational programs appropriate to Mr. DiModica's level intellec-

tual ability.

31.   Other level 4 prisons have far greater opportunities for prison employment and for earning more money.

32. The defendants have failed to make a reasonable accomodation in the employment opportunities available to Mr. DiModica due to his handicap.

33.   The defendants serve Mr. DiModica the same food that is served to all other prisoners throughout the state, with the same excrable preparation in a "chow hall" that is severly overcrowded.  Because Mr. DiModica's cell block is the last one to be called for chow, the prison guards are constantly rushing Mr. DiModica to finish eating, so that they can begin feeding the 300 prisoners who are still serving prison sentences and cannot have any contact with the 300 civilly committed prisoners like Mr. DiModica.

34.   Upon information and belief the Massachusetts Department of Correction and/or the Executive Office of Public Safety receives or has received funding from the United States government.

35.   The defendants have violated Mr. DiModica's right to substantive due process of law under the Fourteenth Amendment to the United States Constitution and his rights under M.G.L. c. 123A, § 6A, by:

(a) holding Mr. DiModica in conditions of confinement which far exceed the least restrictive alternative;

(b) holding Mr. DiModica in conditions of confinement which are substantially more restrictive than the prisons in which

he would be held, if he were still serving a prison sentence
for the only sex offense for which he was ever convicted;

(c) holding Mr. DiModica in conditions which needlessly
and affirmatively worsened Mr. DiModica's mental condition;
and

(d) failing to provide Mr. DiModica with treatment appropriate
to his level of intellectual ability.

The plaintiff is entitled to damages and injunctive relief against
the defendants, including remedial relief, pursuant to 42 U.S.C.
§ 1983, and the plaintiff is entitled to injunctive relief to
enforce M.G.L. c. 123A, § 6A.

35.  Mr. DiModica is a handicapped or disabled person,
because his mental retardation substantially limits one or more
of his major life activities.  Mr. DiModica is being excluded
from meaningful participation and is being denied the benefits
sex offender treatment solely by reason of his handicap. This
exclusion entitles the Mr. DiModica to injunctive and remedial
relief, pursuant to 29 U.S.C. § 794.

36.  The failure of the defendants to make reasonable
accomodations to Mr. DiModica's mental handicap in providing
sex offender treatment, violates the Americans with Disabilities
Act, 42 U.S.C. 12101, et seq.,  as does the failure to make
reasonable accomodations in the prison employment programs and
the recreation and education programs, all of which entitles
Mr. DiModica to injunctive and remedial relief.

37.  Mr. DiModica is deemed to have a mental abnormality or disorder, which requires him to be confined to a secure mental health facility, and therefore limis one or more of his major life activities, under G.L. c. 123A.  This handicap has excluded or denied him from participation in the benefits of the Massachusetts Department of Mental Health and the Massachusetts Department of Mental Retardation.  The failure of the DOC, DMH and DMR to make reasoanble accomodations to Mr. DiModica because of his handcap violates both 29 U.S.C. 794 and 42 U.S.C. 12101, et seq., and entitles Mr. DiModica to injunctive and remedial relief.

RELIEF

Wherefore the plaintiff requests that the court grant the following relief:

1.  Appoint counsel and/or a guardian ad litem for the plaintiff.

2.  The court grant actual and punitive damages against the defendants who have been sued in their individual capacities, Robert Murphy and Kathleen Dennehy, for violation of the plaintiff's civil rights, as provided by 42 U.S.C. § 1983, including costs and attorney's fees as provided by 42 U.S.C. § 1985.

3.  Grant the plaintiff prospective injunctive and remedial relief against all of the defendants as provided by 42 U.S.C. § 1983, 29 U.S.C. 794 and 42 U.S.C. 12101, ordering the defendants to immediately:

(a) refrain from imposing any conditions of confinement which not the least restrictive conditions necessary to protect

Mr. DiModica, the public, other inmates and staff;

(b) fail to provide Mr. DiModica with sex offender treatment, prison employment, education and recreation which makes a reasonable accomodation to Mr. DiModica's mental handcap; and

(c) failing to assist Mr. DiModica in obtaining appropriate less restrictive conditions of confinement and remedial services as offered by either or both the Massachusetts Departments of Mental Health and Mental Retardation.

4.    Grant such further relief as justice and equity require.

Domenic DiModica, Plaintiff,

Domenic V. DiModica, Pro SE
Nemansket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324

January 29, 2005

## Verification

I, Domenic V. DiModica, state under the pains and penalties of perjury (which means that I can go to jail if I am lying), that Joel Pentlarge has read to me this 12 page complaint.  Mr. Pentlarge has tried to explain to me the parts of the complaint which I do not understand.  I believe that the facts (what I said or did, what the staff said or did and what other inmates said or did) are true as best I can tell.

Signed under the pains and penalties of perjury.

January 29, 2005

Domenic V. DiModica

EXHIBIT

1

# REPORT OF

# PSYCHOLOGICAL AND SEXUAL EVALUATION

## Of

## Domenic DiModica

### Submitted to

### Sondra Schmidt
### Attorney-at-Law
### Box 174
### Hingham, Massachusetts
### 02043

### By

Barbara K. Schwartz, Ph.D.

### August 2004

## INTRODUCTION

Domenic DiModica is a 53-year-old Caucasian male who is petitioning the court to lift his Sexually Dangerous Person designation under Section 123A.

## PROFESSIONAL BACKGROUND OF EXAMINER

I have attached to this report a résumé of my training, professional experience, and publications in the field of evaluating and treating sex offenders. To summarize my background briefly, I have 31 years of experience working with sex offenders. I have directed Sex Offender Treatment Programs for the Departments of Correction in New Mexico, Washington State, and Massachusetts, as well as operated DOC Sex Offender Treatment Programs through my private company in New Jersey and Missouri. I have consulted on sex offender treatment in over 30 states as well as Canada and Israel. I have been retained to do evaluations of sex offender programs for the courts in Kansas, Wisconsin, Washington State, and California. Additionally I am the author of *Facing the Shadow*, a workbook for treating sex offenders and am the editor and/or co-editor of *Treating the Incarcerated Male Sex Offender*, published by the United States Department of Justice and *The Sex Offender, Volumes 1-4* and *Correctional Psychology*, published by the Civic Research Institute. I have personally treated and/or evaluated over 1,000 sex offenders and supervised the treatment of approximately 5,000 others. I was the Clinical Director of the Massachusetts Treatment Center from 1992-2002.

## CURRENT STATUS

Mr. DiModica was evaluated at the Massachusetts Treatment Center on August 13, 2004. He is a short, Caucasian male with long, curly, white hair and a long, white beard. He speaks with a distinct lisp and is of obviously limited intelligence. He was neatly dressed with appropriate hygiene. He was cooperative and pleasant but easily confused, having a great deal of difficulty relating his social history. It was particularly difficult for him to identify the ages at which different events occurred in his life. He appears to have limited insight and judgment. Delusions and hallucinations were denied. He reported that he does not experience depression or anxiety. His sleeping and eating patterns are within normal limits.

The Lamb warning was explained to Mr. DiModica. He was told that anything that he said could be included in this report, which would be submitted to his attorney and be presented during his Section 9 hearing. Additionally he was told that he could terminate the interview at any time and could refuse to answer any question. Mr. DiModica stated that he understood the limitations of confidentiality and wanted to continue with the interview.

## SYNOPSIS OF BACKGROUND HISTORY

### Family History

Mr. DiModica was born on September 14, 1950 in Boston, Massachusetts to Camille and Salvatore DiModica, the older of two boys. His brother, Joey (52), is a plumber who is divorced with five children. Mr. DiModica stated he grew up in the North End of Boston (actually he grew up in Somerville), surrounded by a large extended family and was close to both sets of grandparents. He reported that he had "a beautiful relationship" with his father who lives with his mother in Peabody. Mr. DiModica became very confused when describing his father's occupation, stating that he had his own business as "a presser" but when asked if he had a shop, he could not confirm that he did. He stated that his father did not have a drinking problem or a bad temper and never abused family members.

Mr. DiModica stated that his mother is "a nice person" who worked as "an electrician." Apparently he actually meant that she worked in some type of electronics plant as an assembler. Mr. DiModica stated that his parents disciplined him by sending him to his room and never physically abused him in any way. His family was not religious, but Mr. DiModica stated that he did go to church. He said that he went to a Catholic Church called the Assembly of God, evidently confusing a Protestant church with Catholicism.

### Educational and Employment History

School was very difficult for Mr. DiModica who stated that he did not like school and skipped as frequently as he could. Other children teased him, and he was made to sit in the back of the room, away from the other students. He denied ever getting into trouble or fights with his peers, but said he had no friends. He stated that he was in special classes throughout his education, but would then describe how he was shunned by his classmates due to his learning difficulties. He attended South Junior High School and continued to have learning problems, as he was totally illiterate. Mr. DiModica said that he repeated the eighth grade six times and stopped going to school when he was twenty years of age. This would appear to be unlikely.

The records show that he began his education in a local parochial school but was unable to keep up and was transferred to St. Dominic's Academy in Waverly, Massachusetts, which he attended for several years. It was at this time his parents realized that he was mentally retarded and transferred him to a public school where he participated in special education. Following the assault on the seven-year-old boy, he was asked to leave school in 1966 because he was "too immature, and he was causing difficulties."

After he was convicted of assaulting a young boy, the judge referred him to the Somerville Clinic where the staff arranged for him to be placed at the John T. Berry Rehabilitation Center in North Reading, Massachusetts. He remained there for several years where his Full Scale IQ was measured at 67. He was released in August 1970 as "both socially and sexually immature and unable to learn proper work skills and habits." While at that facility he was identified as being involved in, what appeared to be, two episodes of consenting sexual behavior with peers.

At the Treatment Center he participated in educational classes and was individually tutored by a professional teacher who was a resident of the Treatment Center. Consequently he has learned to read well enough to read for pleasure.

After leaving school he stated that he got a job in an assembly plant where he worked for six months. (Mr. DiModica identified all time periods as six months. He reported that his jobs, his relationships, and his participation in various programs all lasted for six months.) After this job he reportedly worked as a maintenance man in an underground garage that was under a landscaped area, which he stated that he helped to maintain. He repeatedly said that on the day that he molested the three-year-old victim, he was fired for "eavesdropping" on his supervisor.

His records indicate that when he went back to living with his parents, his father got him a job at a local gas station but he was fired for poor work performance. From May 1981 until September 1981 he was assigned to a sheltered workshop but quit. For a short time in the fall of 1981 he worked as a dishwasher but was fired because of an emotional outburst on the job. From November 1981 until April 1982 he worked in a pre-vocational workshop and from May to October 1982 he was in a transitional workshop. He left that program to look for work but was returned to the pre-vocational workshop. Next he was able to get another job as a dishwasher but again was fired.

## Relationship History

Mr. DiModica stated that he has had two significant romantic relationships, but neither was sexual. He initially went with a woman named Margo who worked in a factory. He stated that they went together for about six months and broke up when his second girlfriend, Frances, lured him away from Margo. He said that they went together for two or three months and were going to get married when she left him for another man. Mr. DiModica indicated that he believes that he can look up Margo and revive their relationship because he knows where she worked over twenty-five years ago. He reluctantly admitted that she might not still work there. None of this information about girlfriends is included in his records.

## MEDICAL HISTORY

Mr. DiModica stated that his only health problem is asthma for which he uses an inhalator. His records indicate that he was seen at Massachusetts General Hospital for failure to grow and that he remained at twelve pounds throughout his first year, although he apparently reached developmental milestones at a normal age. He had surgery on an undescended testicle between the ages of nine and twelve. In 1965 he was diagnosed with "Primary Simple Oligophrena with physical degeneration." In the parlance of that time, this term literally meant "feebleminded." He was also treated with hormones for nine months at some time during his adolescence in order to address his abnormal physical immaturity.

## MENTAL HEALTH HISTORY

After the attack on the young girl, Mr. DiModica was evaluated by the court clinic who referred him to Westborough State Hospital for observation. In June 1971 Mr. DiModica was inadvertently sent to Bridgewater State Hospital for a competency evaluation. According to V. Curcia of the Department of Mental Retardation, the judge had ordered Mr. DiModica sent to the Bridgewater Treatment Center for evaluation as a Sexually Dangerous Person. The judge then reordered him sent to the Treatment Center but he was mistakenly sent back to the State Hospital where he received another competency evaluation. Both of these evaluations focused exclusively on whether Mr. DiModica was psychotic, which he was not.

He was also admitted to Danvers State Hospital on two occasions. He was sent to Danvers as a transitional plan in 1980 and then briefly recommitted after a sexual assault in the community in 1984. Mr. DiModica stated that he was sent to Bridgewater State Hospital with suicidal ideation after he was reportedly sexually assaulted at the Treatment Center. His records indicate that he was sent to Bridgewater State Hospital in 1974 and 1979, once for attempting suicide and once for bizarre behavior that was diagnosed as schizophrenia.

## SUBSTANCE ABUSE HISTORY

There is no history of substance abuse.

## SEXUAL HISTORY

Mr. DiModica stated that his introduction to sexuality was when he was molested by a male babysitter, a married man that lived in the same apartment building. First he said that he was 15 to 18 when this happened. Then he said that he thought his records might state that he was two to four years old. Finally he indicated that he was probably 12 to 15 years of age. Mr. DiModica only mentioned this late in the interview when pressed for possible contributing factors to his sexually

inappropriate behavior. He reported that this man forced him to perform oral sex and would give him enemas and anally rape him. Mr. DiModica stated that his parents eventually found out about this molestation and threatened the neighbor, but did not report this abuse to the police.

Mr. DiModica said that he was raped at the Treatment Center during his first incarceration there. He was apparently tied to a beam and anally penetrated, then left to hang there. He reports that this severely traumatized him, eventually resulting in hospitalization at Bridgewater State Hospital with suicidal ideation.

Mr. DiModica indicated that he fantasizes about his girlfriend but denied ever masturbating to thoughts of children. He masturbates approximately three times a day. He has been involved in numerous sexual activities at the Treatment Center that are described below.

## OFFICIAL VERSION OF ALLEGATION

The official versions of the first two offenses are taken from the Admission Summary prepared on August 25, 1971. The first offense that occurred when he was 16 years old was reported as follows:

> Somerville Police answered a complaint on April 17, 1967 by a A.C. d.o.b. 9/30/59.
>
> The boy stated that about 3:30 p.m. he and another boy were at the site of the Cholerton School watching a bulldozer. About this time a boy described as about 15 with a short funny face came up to him and hit him. A. stated that he did not know this boy and that when this happened the boy grabbed him by the arm and pulled him across the street.
>
> A. stated that he was crying and asked the boy to let him go but he refused. The boy then pulled Allen into an alley between buildings and took down his pants. He told the boy to be quiet and what he was doing would not hurt him. A. stated that the boy then put his hand between his legs and put his finger into his rectum. The boy started to scream and this boy then held him tight and put his face on his stomach. A. was screaming for the boy to let him go and someone passing saw him and ran to help. The assailant was chased by other passerbys but the boy jumped a fence, ran and made good his escape.

The second offense, which occurred when he was 20 years of age, was described as follows:

> Somerville Police reported that on May 11, 1971 Mrs. H. related the following: Her 3-year-old daughter was outside playing and at approximately 10:30 a.m. came to the door crying. The girl stated to her mother that a man down the street had hurt her and upon examining her found that the girl's underpants were covered with blood. She took her daughter out to show her the house and she pointed to 201 Morrison Avenue. Mrs. H. knew a boy who lived there by the name of Domenic DiModica whom she believed to be retarded.
>
> Police went to this house, rang the bell and while waiting, Domenic came from the back of the house and approached them. Both his parents were working. Police told him that they wanted to talk to him and his father about the H. girl and Domenic became upset and started to cry. He asked the police not to tell his father about the girl and to let it pass. Domenic was placed under arrest and advised of his rights.

The third assault occurred on March 2, 1984. On that date, while a patient at Danvers State Hospital and attending the Endicott Center Day Treatment Program in Salem, Mr. DiModica sexually molested a mentally retarded client of Ms. Susan Davison, Department of Mental Health service coordinator for the Cape Ann area. A report from the Department of Mental Health Cape Ann Office reports the following:

> On the morning of Friday, March 2, 1984, Pat Corby, along with other Gloucester clients, took the train to Salem Depot. She arrived at 8 a.m. and proceeded to walk to the coffee shop located on Washington Street to purchase a cup of coffee. This is a routine that Pat has been doing for more than a year. Domenic was sitting at the counter when Pat entered the coffee shop. He said hello to Pat and she said hello in return. Domenic asked Pat if she would like to go outside for a walk. She agreed. When outside, Domenic told Pat he had to go to Eatons and did Pat want to go with him. She replied that she did. After going to Eatons where Domenic purchased a newspaper, they went outside and walked down the block where they turned and went behind the buildings located on Washington Street. It was at this point that Domenic put his hands down the front of Pat's

pants. When she tried to call for help, he placed one hand over
her mouth. He removed his hands and Pat said, "Domenic,
that's a no-no." She then left and walked back to the coffee shop
to wait for the next bus. She was standing on the sidewalk
crying when she was approached by a man who told her he was
a minister. He asked Pat why she was upset. Pat replied that
Domenic had done a no-no to her and explained what he had
actually done.

There is one report that Mr. DiModica admitted to Marc Whaley in 1984 that he
had engaged in sexual activities with his young cousins between the ages of three and
five by digitally penetrating them. This is the only report that mentions this activity.

## MR. DIMODICA'S VERSION OF THE ALLEGATION

According to Mr. DiModica he molested a seven-year-old boy by inserting his
finger into the boy's anus. He stated that he received six months' probation for this
offense. He may have been sent to the John T. Bailey or Berry Center where he lived
during the week and went home on weekends. Additionally he may have spent some
time at Danvers State Hospital; however, he admits that he is very confused about this
part of his life.

Mr. DiModica stated that in 1972 he was in his house when he saw a three-year-
old girl on a ledge outside his home. He went out to get her, took her inside his
apartment, and digitally penetrated her. He indicated that she was crying, and that he
opened the door, and she ran home. She told her mother, and he was immediately
arrested and taken directly to the Massachusetts Treatment Center where he remained
until he was released in 1980. (Mr. DiModica has a very hard time remembering the
correct dates.)

He reported that his next offense occurred in 1981 or 1982 when he met a 32-
year-old woman in a restaurant. He indicated that this individual apparently worked
in a sheltered workshop. They left the restaurant together, and she asked Mr.
DiModica if he would buy her a candy bar. He said he would and escorted her to a
drugstore but it was closed. He then took her into an alley and, according to his report
to me, asked if he could touch her. When she did not object, he digitally penetrated her
vagina. She then ran out of the alley. He believed that she was crying because she had
missed her bus to work. A man in a green car picked her up, and Mr. DiModica was
arrested shortly thereafter.

## INSTITUTIONAL ADJUSTMENT

In a memo prepared by V. Curcio that "reflects the confusion of the court system and the issue of lack of appropriate services for certain mentally retarded individuals," she outlines how Mr. DiModica was repeatedly sent to the wrong institutions for his evaluations, twice being sent to Bridgewater State Hospital, rather than Bridgewater Treatment Center, and then being placed at Billerica Prison. "At that prison Domenic was badly treated sexually by other inmates. The wardens knew about this but said they could do nothing."

Mr. DiModica remained there for seven months as his trials were postponed three times because various individuals did not appear. Eventually he was placed in the Bridgewater Treatment Center in August 1971, and Joseph Petrelli and Nicholas Groth, Ph.D. observed that:

> Beyond an obvious physiological abnormality (Mr. DiModica has the appearance of a preadolescent), the most impressive feature of this patient is his mild mental retardation. Patient's thought process is limited to the most concrete/tangible aspects of existence; he also experiences considerable confusion over time and chronological order of events. The subtle nuances and cues of social conventions appear to totally escape him, and he appears to be able to entertain highly inconsistent thoughts with only minimal dissonance. Patient possesses little ability for introspection or self-reflection. Patient clearly does not appreciate the nature of his observation or the possible implications of his commitment to this institution. Rather he tends to depend exclusively on those he perceives as being in authority to determine what the future might hold for him. The patient does not appear to be amenable to the type of treatment ordinarily available at this Unit; a recommendation for commitment should be made with the knowledge that the prognosis for this patient is extremely guarded.

His DMR caseworker noted that Dr. Groth of the Treatment Center did not feel that the program there could help him but it was preferable to incarceration in a maximum-security prison.

In 1975 R. Smith stated that "we should look for alternative placement facilities for Mr. DiModica." In 1976 R. Smith stated that "I hope alternatives for his placement can be located before the beginnings of what I sense to be a downward spiral becomes more ominous." In October 1976 Mr. Smith stated:

> There is no way that Domenic DiModica belongs in the
> Treatment Center. Presently it appears to me that more harm
> than good is being done to him. He is not enrolled in school, nor
> is he learning a viable trade. Instead he is subjected to
> influences and manipulations which are anything but
> therapeutic.

Seven months later Mr. Smith stated that "Domenic appears to have fallen through the adapting stage and hopelessly seems to be succumbing to the degenerative atmosphere surrounding him."

Evaluations conducted during his first stay at the Treatment Center clearly reflected the opinion that his placement was inappropriate. In September 1971 R. F. Eldgerly stated that "All things considered he is not a good candidate for the type of treatment offered at the Treatment Center and would be better served by a placement in some other unit such as a state mental hospital."

In May 1973 W. Rafferty stated that "The patient is not responding well to our treatment plan" and that he needs to be in a "gentler, less punitive place where he would not be brought into contact with other patients clearly inappropriate for him to be near."

Dr. Seghorn stated in 1977 that "He has always been easily led at the Treatment Center, and this has led to his apparently indiscriminate sexual exploitation here."

In February 1979 J. Stephen Heisel, M.D. reported that "Mr. DiModica has been repeatedly exploited by 'father figures' he encounters within the institution." The doctor also noted that at that time, Mr. DiModica, although 28 years of age, appeared to be 14 years old.

In April 1979 R. Moore, M.D. wrote to the Superior Court Judge of Middlesex County that:

> I note that at the time of his commitment, it was recommended
> that he should be committed to a state hospital under the
> delinquent law rather than to the Treatment Center. I further
> note that some members of the staff at the present time feel that
> Mr. DiModica has been deteriorating since his commitment, and
> that the Treatment Center is a highly inappropriate placement
> for him.

A progress report from June 1979 indicated that:

Because of his adolescent appearance and childlike behavior, Mr. DiModica has become involved with many older pedophiles at the Treatment Center. At times he has been abused and induced into excessive and bizarre sexual activity by these patients. Often, however, he actively sought such contacts and exploits his sexual appeal to others. Generally, these experiences have heightened his sexuality while reinforcing his passivity and sense of entitlement. Although there has been a genuine effort on the part of some residents to be of assistance, the rewards Mr. DiModica receives for maintaining maladaptive behaviors has prevented significant growth or development. He is seen to be and is treated as a child and his behavior closely matches this perception. At times Mr. DiModica has become quite frustrated and depressed. He has been hospitalized once for a suicide attempt and once for having exhibited bizarre behavior.

In July 1980 Mr. DiModica was ordered transferred to Danvers State Hospital and was admitted on a voluntary commitment. He remained there from that date until February 1981 when he was transferred to a group home for the mentally retarded where he would participate in training at the J. T. Berry Center.

Mr. DiModica was unable to care for himself in the group home and was transferred to Respite and then back to the hospital. While awaiting his Section 9 hearing, he was going out of the hospital and attending the Endicott Day Treatment Center reluctantly, and hanging out in the community. It was at this time that he engaged in sexually inappropriate behavior and was returned to the Treatment Center.

In 1986 he was placed in the Community Access Program in the pre-release house and given a job on the grounds crew, but he was terminated from that job in 1987 for physically assaulting another resident.

Mr. DiModica has made minimal progress in the treatment program although in 2001 and 2002, working with Sara Dubik-Unrah, M.S., in a program based on Dialectical Behavioral Therapy, he did make some progress. He was credited with achieving goals related to denial, as well as understanding some of his motivators and disinhibitors, and his participation in the Unit improved.

However, he is currently not being credited with having definitively achieved any treatment goals. He has taken a phallometric assessment and showed no arousal of any kind. His goals continue to focus on traditional sex offender tasks in a cognitive

behavioral treatment program, which focuses on intellectually understanding a variety of sophisticated concepts.

Mr. DiModica has had countless disciplinary reports over the years for, among other things, being sexually inappropriate. Mr. DiModica stated that he is guilty of these inappropriate acts but that since he was originally committed he has been the "sex toy" of the other residents of the Treatment Center. He became quite emotionally distraught when discussing this.

He readily admits that his most recent and probably most serious offense happened in January 2003. Mr. DiModica stated that a resident approached him and asked him to participate in sexual activity with another inmate. Despite the fact that only residents of a certain privilege level are allowed to visit in each other's rooms, these three men who are known to be sexually active were allowed to congregate in the room of Mr. DiModica's coconspirator (M.F.). During the sexual assault, which began consensually, the victim objected to the behavior but the perpetrators continued. Mr. DiModica stated to me that during the height of the assault he was afraid to leave the room to call the officer because M.F. was choking the victim, and Mr. DiModica was afraid that he would kill him. Of course, this places Mr. DiModica in a better light. However, Mr. DiModica did seriously present the argument that he went along with this behavior because he wanted to have a friend, and M.F. promised to be his friend.

## RESULTS OF PSYCHOLOGICAL TESTING

*Wechsler Adult Intelligence Scale-Third Edition: This is the most widely used, individually administered adult intelligence test.*

Mr. DiModica received a Verbal IQ of 61, a Performance IQ of 57, and a Full Scale IQ of 56. This score is primarily lower than his previous scores because in the third edition, Object Assembly, a test composed of puzzles of common objects, was consistently Mr. DiModica's highest score on previous tests. This is probably the result of a practice effect as once one knows what the puzzles consist of, it is significantly easier to complete them on subsequent administrations. Again his score was the highest on this test. Additionally several new scales have been added to this edition. Verbal Comprehension IQ equivalent was 59. Perceptual Organization IQ equivalent was 70. Working Memory IQ equivalent was 69, and Processing Speed IQ was 68. Mr. DiModica consistently scored below the 2%tile on all tasks.

His comprehension of the world is framed in terms of his experience at the Treatment Center. For example, he defined the word "terminate" as having to start his Section 9 hearing over again. He stated that child labor laws are enforced "So that

people like us don't bother them." He does not understand the concept of similarities versus differences. His scores fall uniformly within the mild mental retardation range.

## DISCUSSION AND CONCLUSIONS

Mr. DiModica is petitioning for reconsideration of his involuntary commitment as a Sexually Dangerous Person according to M.G.L., Chapter 123a, Section 1 as follows:

> A sexually dangerous person is any person who has been convicted or adjudicated as a delinquent juvenile or youthful offender by reason of a sex offense and who suffers from a mental abnormality or personality disorder which makes that person likely to engage in sexual offenses if not confined to a secure facility, has been charged with a sexual offense and was determined incompetent to stand trial, and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility, or a person previously adjudicated as such by a court of the Commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim or aggression against any victim under the age of sixteen, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of this uncontrolled or uncontrollable desire.

> Personality disorders are further defined as "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." Mental abnormalities are further defined as "a congenital or acquired condition of a person that affects the emotional or volitional condition of a person in a manner that predisposed the person to the commission of criminal sexual acts to a degree that makes a person a menace to the health and safety of other persons.

Mr. DiModica is a 53-year-old Caucasian male from an intact family who was born with a condition that was diagnosed as Primary Simple Oligophrena with physical degeneration. This condition is an antiquated term meaning "feeblemindedness" and in this case is associated with mental retardation and delayed physical development.

He failed to progress in school and was finally placed in a special education classroom but was asked to leave after he sexually molested a seven-year-old boy. Before that time, Mr. DiModica himself had been sexually molested by a babysitter who practiced anal penetration as part of the abuse. Prior to this, he had been given a course of hormone (probably testosterone) treatment to stimulate his physical and sexual development. However, the drug was not helpful in accomplishing this.

Mr. DiModica was placed in a facility for the mentally retarded but was dismissed due to his inability to benefit from the vocational training and "his sexual immaturity." While residing at home after his dismissal from this school, he molested a three-year-old girl. He also self-reports that he molested several cousins. However, it should be cautioned that he is a very unreliable informant who is highly compliant to the suggestions of other people, and might confess to additional victims under pressure from others. Nevertheless, his known pattern of behavior would certainly suggest that there might have been more victims than he was charged with.

Following the assault of the three-year-old girl, Mr. DiModica was repeatedly sent to various mental hospitals to be evaluated as to competency to stand trial. However, he was only assessed for the possibility of psychosis, not his mental retardation. Eventually he was sent to the Massachusetts Treatment Center where it was determined that he was a Sexually Dangerous Person by professionals who felt that commitment to that facility should only be a last resort if the only other alternative was being sentenced to prison. His records indicate that at the time of his commitment, he was prepubescent. With the appearance of a small, vulnerable young boy being placed in an institution containing the Commonwealth's most predatory pedophiles, he was subjected to multiple sexual assaults with at least one violent rape, according to him. The staff was adamant that he did not belong in that institution as he could not benefit from the type of therapy offered and was continually being involved in a variety of sexually deviant activities. After five years the staff was able to have the judge change his commitment to Danvers State Hospital.

Although unsuccessful in being able to work or live in the community independently, there is no suggestion that he molested or accosted children in the area. However, he did fondle a developmentally disabled adult woman whom he believed was consenting, as she did not strenuously resist the inappropriate behavior. Following this incident, he was returned to the Treatment Center in 1984. Mr. DiModica continues to reside at this institution making very little progress in treatment.

Mr. DiModica meets the diagnostic criteria for Mild Mental Retardation (317) in that his IQ level is between 50-55 to approximately 70, and he shows significant impairment in adaptive functioning. During the brief period when he was attempting to function in the community, he was unable to maintain employment, manage his money, sustain an independent living arrangement, or engage in appropriate social/interpersonal functioning or self-direction.

When Mr. DiModica's profound physical, emotional, and sexual immaturity is taken into account, it is doubtful whether a diagnosis of Pedophilia would be meaningful. The essence of this diagnosis is that this is a condition where an adult is

sexually attracted to prepubescent children. In a situation where the "adult" is maturationally a child, it is meaningless to describe this individual as a pedophile. He has admitted to sexual fantasies about children but has also denied this.

Additionally he is very easily influenced and would most likely tell a group or a therapist what he thought they wanted to hear. While in the community, there was no evidence of his sexual interest in children, and his last victim was an adult female. Today he would be classified as a sexually reactive adolescent abuser, who may have been treated with a male hormone to stimulate sexual development while at the same time being intellectually and neurologically handicapped in understanding and controlling his sexual impulses.

Mr. DiModica may well be suffering from Post-Traumatic Stress Disorder from his multiple sexual victimizations. He becomes highly agitated and upset when relating that his only function in life is to "be a sex toy." He certainly feels helpless, has distressing recollections of these assaults, and attempts to avoid this stimuli by withdrawing and isolating, affective numbing, and detaching from others. He is described as having outbursts of anger, and having difficulty concentrating. This could be related to his mental retardation but exaggerated by his response to his trauma.

Numerous evaluators over the years have commented on the inappropriateness of placing this individual with predatory adult sex offenders who can take sexual advantage of him. This is exactly what has happened over the years. By definition, he is not competent to make decisions about his sexual behavior, and thus every situation in which he has been involved is one more incident of his sexual abuse. In the most recent occurrence he was recruited by perhaps the most predatory man in the Treatment Center. It should be noted that since his initial commitment, the basis for relating to others at the Treatment Center has been his sexuality.

Mr. DiModica is not intellectually capable of engaging in the treatment offered at the Treatment Center. He has an extremely poor memory. He could not accurately tell how old he is, or where he was raised. He repeats his description of the offenses in a rote manner with little, if any, insight or possibly real memory for the crimes or the events leading up to them. Additionally he failed to reveal the first offense until I repeatedly pressured him about it. At this point he became so upset that he was highly agitated and thoroughly confused.

It is highly unrealistic to imagine that this individual could ever devise a Relapse Prevention Plan or understand how motivators or disinhibitors dynamically relate to his offenses. He is not going to be able to profit from any therapy that relies on insight or understanding of the past to prevent future reoffending. For Mr. DiModica to be able to benefit from treatment, it needs to be in a supportive, highly structured environment where he can be taught appropriate responses and controls on a here-and-

now basis. Mentally retarded sex offenders are currently being maintained in the community under close supervision and trained on techniques for controlling their behavior in actual situations.

In addition he is clearly hypersexual, reporting that he masturbates three times a day when the cutoff for sexual compulsivity is five sexual outlets a week. The treatment for this condition is psychopharmacological, an intervention that is not used at the Treatment Center.

It is currently impossible to evaluate this individual's level of sexual dangerousness due to his unusual circumstances. He would score very low on any risk assessment, as his only conviction was one as a juvenile for which he received probation. Actuarials were not intended for use with individuals at his level of cognitive impairment. When he was initially released from the Treatment Center, it was without having received treatment geared to his functional level, and he did not receive sex offender treatment or appropriate supervision while in the community. He is continuing to be made the target of sexual abuse by other residents, and his inherent role of victim is not being recognized.

Mr. DiModica needs to have a court-appointed guardian to help him with making decisions and protecting his rights. He also needs to be assisted in applying to the Massachusetts Department of Mental Retardation to have his case reopened so that he can be considered for appropriate services.

Sincerely yours,

**New England Forensic Associates**

Barbara K. Schwartz, Ph.D.

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Domenic V. DiModica

2005 FEB -4 P 1: 38

U.S. DISTRICT COURT
DISTRICT OF MASS

**DEFENDANTS**

Robert Murphy, Kathleen Dennehy
and the Mass. Dept. of Correction

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Plymouth
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Plymouth
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se
Nemasket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324

ATTORNEYS (IF KNOWN)

05 - 10286 PBS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | **PERSONAL INJURY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 362 Personal Injury — Med. Malpractice | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 365 Personal Injury — Product Liability | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 368 Asbestos Personal Injury Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 340 Marine | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence HABEAS CORPUS: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 442 Employment | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | |
| | ☒ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to District
Judge from
☐ 7 Magistrate
Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

This is an action for violation of the civil rights under 42 U.S.C. §1983
and the 29 U.S.C. § 794 and 42 U.S.C. §12101 the ADA.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____

DOCKET NUMBER _____

DATE
1/29/05

SIGNATURE OF ATTORNEY OF RECORD
Domenic Di Modica , Pro Se

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____