UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No.

DOMENIC V. DiMODICA,

    Plaintiff,

vs.

05-10286 PBS

ROBERT MURPHY,
KATHLEEN DENNEHY, and
THE MASSACHUSETTS DEPARTMENT OF CORRECTION,

    Defendants.

## MOTION FOR APPOINTMENT OF COUNSEL
## AND/OR A GUARDIAN AD LITEM

The plaintiff Domenic V. DiModica moves that the court appoint counsel to represent him in this case. The report of Dr. Barbara Schwartz, Ph.D., which is attached as Exhibit 1 of the complaint, shows that as most recently tested Mr. DiModica has an IQ of 56. (See page 12 of the report.) This put Mr. DiModica in the range of mild mental retardation with an IQ of between 50 and 70. (Page 14 of the report.) An attorney who has represented Mr. DiModica for years has concluded that he needs a guardian ad litem or advocate. (Attached to this motion is a copy of the Motion to Continue Hearing Date and for Appointment of a Guardian/Advocate, which was filed on behalf of Mr. DiModica by Attorney Sondra H. Schmidt, who is representing Mr. DiModica in a petition for discharge which has been pending in the Massachusetts Superior Court since 1998.)

THE MERITS OF THIS CASE

As both Dr. Schwartz and Attorney Schmidt point out in extensive detail, based primarily on the records of the Treatment Center, in thirty-three years of institutionalization, Mr. DiModica

has been raped, sexually victimized and exploited countless times. The records also document a history of official knowledge and aquiesence to this sexual abuse, which would make even Cardinal Law blush. Compounding this sexual abuse was the complete lack of treatment at a level where Mr. DiModica could understand it, while at the same time blaming Mr. DiModica for his failure to make any progress in sex offender treatment and using that as a reason to continue his incarceration in conditions which are more restrictive than the prisons he would be held in if he were serving a criminal sentence. The failure to provide him with appropriate treatment clearly violates his right to substantive due process of law under the Fourteenth Amendment to the United States Constitution. Youngberg v. Romeo, 457 U.S. 307, 324 (1982). The failure to make a reasonable accomodation to Mr. DiModica's handicaps of being mentally retarded, and whatever the mental abnormality may be that has caused him in the past to be "sex offender," violates the Americans with Disabilities Act, 42 U.S.C. 12101, et seq. and the Rehabilitation Act, 29 U.S.C. 794. See Atwood v. Vilsak,    F.Supp.2d    (S.D. Iowa 2004). The failure to provide Mr. DiModica with the least restrictive alternative violates both G.L. c. 123A, § 6A and the requirements of substantive due process under the Fourteenth Amendment. Youngberg v. Romeo, supra. Imprisoning Mr. DiModica in conditions which are more restrictive than prison, creates a presumption that the conditions are punitive and therefore violates the double jeopardy clause as well as due process. Jones v. Blanas,    F.3d    ,    (9th Cir. 2004). The deliberate indifference of the Treatment Center staff to the repeated rapes and sexual victimization of Mr. DiModica,

violates his right to substantive due process. <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). Mr. DiModica's mental retardation must in someway put the staff of the Treatment Center on greater notice, or create a higher standard of care, to prevent the rapes and sexual victimization repeatedly documented in the records of the Treatment Center.

<u>MR. DiMODICA'S ABILITY TO REPRESENT HIMSELF</u>

As is set out in more detail in affidavit of Joel Pentlarge, another prisoner at the Treatment Center, Mr. DiModica has no ability to represent himself, because of his mental retardation. Mr. DiModica really needs an guardian ad litem to help him make the decisions about how this litigation should proceed and to help him advocate for services and placement that will be appropriate for him. Even with the assistance of other prisoners the issuses presented by this case are far too complicated, and the Department of Correction bureaucracy is far too resistant to change for Mr. DiModica to be able to pursue this case without counsel. Particularly when it comes to investigating and setting up an alternative placement with the Department of Mental Health or the Department of Mental Retardation Mr. DiModica needs a skilled advocate who can access facilities and resources beyond the prison walls of the Treatment Center.

Mr. DiModica respectfully requests that the court appoint counsel and/or a guardian ad litem.

Domenic V. DiModica, Plaintiff

*Domenic DiModica*
Domenic V. DiModica, Pro Se
Nemansket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324
January 30, 2005

4

## Certificate of Service

    I, Joel Pentlarge, state under the pains and penalties of perjury that I have served a copy of the foregoing motion for appointment of counsel and/or a guardian ad litem together with a copy of the complaint in this action on Robert Murphy, Nemansket Correctional Center, 30 Administration Rd., Bridgewater Ma. and Attorney Mary Murray, Nemansket Correctional Center, 30 Administration Road, Bridgewater, MA by DOC Mail, and by first class mail on Kathleen Dennehy and the Massachusetts Department of Correction at 50 Maple Street, Milford, MA 01757 and Attorney General Thomas Reilly at One Ashburton Place, Boston, MA 02108.

February 2, 2005

                                                Joel Pentlarge

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No.

DOMENIC V. DiMODICA,

    Plaintiff,

vs.

ROBERT MURPHY,
KATHLEEN DENNEHY, and
THE MASSACHUSETTS DEPARTMENT OF CORRECTION,

    Defendants.

## AFFIDAVIT OF JOEL PENTLARGE

I, Joel Pentlarge, state under the pains and penalties of pejury that:

1. My name is Joel Pentlarge, and I have been committed as a sexually dangerous person pursuant to M.G.L. c. 123A to the Nemansket Correctional Center since July 2004.

2. I am making this affidavit both to support Domenic DiModica's motion for appointment of counsel, and in light of the exploitation of Mr. DiModica, to make it transparent what my role has been assisting Mr. DiModica to gain access to the United States District Court.

3. I was admitted to practice law in Massachusett in 1977, and disbarred in 2000 after pleading guilty to five counts of statutory rape. I understand that it is illegal for me to engage in the practice of law, but at the same time I have as much right as any other prisoner to assist other prisoners in gaining access to the courts. See Bounds v. Smith, 430 U.S. 817 (1977); and Lewis v. Casey, 518 U.S. 343 (1996); Johnson v. Avery, 395 U.S. 483, 488-490 (1969).

    4.  Mr. DiModica is housed on the ~~cell~~ same block as I am at the Treatment Center. During the past week Mr. DiModica approached me to assist him with writing a simple letter to attorney Sondra Schmidt, who is representing him in petition to be discharged from the Treatment Center under G.L. c. 123A, § 9. Mr. DiModica wanted to know from Attorney Schmidt when the trial date was scheduled in his § 9 hearing. Mr. DiModica had no idea when his § 9 case had been filed (1998) or that subsequent § 9 petitions had been filed (including in 2004). Nor did he have any grasp of what the issuses were in his § 9 petition. He was able to provide me with Dr. Schwartz's report and Attorney Schmidt's motion for appointment of a guardian or advocate.

    5.  Reading the report and motion I was appalled by the extent to which the Treatment Center staff had allowed Mr. DiModica to be victimized by other inmates, while providing him with no treatment at a level which he could understand, and keeping him in conditions of confinement that are far more restrictive than necessary, and which are more restrictive than prison.

    6.  I offered to help DiModica file a complaint for violation of his civil rights, which he readily agreed to, but I doubt that he has any real understanding of the ramifications of such a law suit.

    7.  I wrote the complaint which I based almost entirely on the facts and records quoted by Dr. Schwartz in her report and the records quoted in the motion of Attorney Schmidt.

    8.  I read the entire complaint to Mr. DiModica, and tried

to explain it to him as I read it to him.  My sense is that he understood simple statements of fact, but has no understanding at all of the legal concepts contained in either the complaint or the motion  for appointment of counsel.

4.  In light of Mr. DiModica's intellectual level it would impossible for him to represent himself in this matter.  Because of his mental retardation the Treatment Center staff have both victimized Mr. DiModica and allowed other inmates to victimize him shamelessly.  This victimization of a mentally retarded person cries out for rectification.

5.  I have accepted absolutely nothing in return for my assistance to Mr. DiModica.

6.  I can assist Mr. DiModica in getting to the courthouse door, but that is no substiute for having an attorney admitted to practice law, who has much better resources at his or her disposal, who access to facilities  and experts outside of this prison, and who can be much more objective.

Signed under the pains and penalties of perjury this 30th day of January 2005.

                                                     _____
                                                     Joel Pentlarge

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.  
(UNIFIED SESSION)

SUPERIOR COURT DEPARTMENT OF THE  
TRIAL COURT OF THE COMMONWEALTH  
DOCKET NO. 98-1469

---

DOMINIC DI MODICA,  
                Petitioner

v.

COMMONWEALTH OF MASSACHUSETTS,  
                Respondent

---

### Motion to Continue Hearing Date and for Appointment of a Guardian/Advocate

NOW comes Dominic DiModica, the Petitioner in the above-captioned matter (DiModica), through counsel, and moves this Honorable Court to appoint a guardian/advocate for him and further continue his G.L. c. 123A, Sec. 9 hearing, which matter is currently scheduled to be heard beginning September 13, 2004.

In support of this motion, counsel states as follows:

1. *Historical Background.*  DiModica was civilly committed to the Massachusetts Treatment Center (MTC) in 1972 (32 years ago).

Several clinicians, and evaluations conducted upon him at that time, urged that DiModica did not belong in the MTC..  [Some of the comments noted in the MTC records:

- "All things considered, he is not a good candidate for the type of treatment offered at the Treatment Center and would be better served by a placement in some other unit such as a state mental hospital." (R.F. Eldgerly, 1971);
- "The patient is not responding well to our treatment plan...he needs to be in a gentler, less punitive place where he would not be brought into contact with other patients clearly inappropriate for him to be near." (W. Rafferty, 1973);
- "We should look for alternative placement facilities for Mr. DiModica." (Smith, 1975);

1

- "I hope alternatives for his placement can be located before the beginnings of what I sense to be a downward spiral becomes more ominous." (Smith, 1976);
- "There is no way that Dominic DiModica belongs in the Treatment Center. Presently it appears to me that more harm than good is being done to him. He is not enrolled in school, nor is he learning a viable trade. Instead, he is subjected to influences and manipulations which are anything but therapeutic." (Smith, 1976);
- "Dominic appears to have fallen through the adapting stage and hopelessly seems to be succumbing to the degenerative atmosphere surrounding him." (Smith, 1977);
- "He has always been easily led at the Treatment Center, and this has led to his apparently indiscriminate sexual exploitation here." (Seghorn, 1977);
- "Mr. DiModica has been repeatedly exploited by 'father figures' he encounters within the institution." (J. Stephen Heisel, M.D., 1979);
- "I note that at the time of his commitment, it was recommended that he should be committed to a state hospital under the delinquent law rather than to the Treatment Center. I further note that some members of the staff at the present time feel that Mr. DiModica has been deteriorating since his commitment, and that the Treatment Center is a highly inappropriate placement for him." (R. Moore, M.D., 1979);
- "Because of his adolescent appearance and childlike behavior, Mr. DiModica has become involved with many older pedophiles at the Treatment Center. At times he has been abused and induced into excessive and bizarre sexual activity by these patients. Often, however, he actively sought out such contacts and exploits his sexual appeal to others. Generally, these experiences have heightened his sexuality while reinforcing his passivity and sense of entitlement. Although there has been a genuine effort on the part of some residents to be of assistance, the rewards Mr. DiModica receives for maintaining maladaptive behaviors has prevented significant growth or development. He is seen to be and is treated as a child and his behavior closely matches this perception. At times Mr. DiModica has become quite frustrated and depressed. He has been hospitalized once for a suicide attempt and once for having exhibited bizarre behavior." (Progress Report, 1979);

2

- "Mr. DiModica would be best served in a placement other than the Treatment Center, more suitably designed to work with the mentally retarded and behaviorally disordered person." (Seghorn, 1984).

In 1980, as the result of a Court order, DiModica was transferred to Danvers State Hospital, and, a year later, to a community residence for mentally retarded adults. He was re-admitted to Danvers State Hospital in 1983, in crisis after losing his job as a dishwasher. Untreated and adequately supervised at the time, he was returned to the MTC in 1984, after sexually assaulting a developmentally disabled adult woman whom he believed had consented.

DiModica has been sexually victimized at the Treatment Center numerous times over the years. He is small in stature and somewhat childlike, despite the fact that he is 54 years of age. He has been raped by multiple individuals and forced to perform fellatio on approximately 20 inmates on one occasion. He has, in turn, sexually victimized others, at times in consort with the same aggressors who acted against him. When he complained that he was afraid of these individuals, his statements were ignored. When he stayed behind on the unit during mealtimes, to avoid certain aggressors, he was disciplined for hiding on the unit and, instead of being offered protections, he was accused of trying to hide so that he could steal while others were at meals. Even years later, DiModica becomes teary-eyed when he describes the sexually aggressive assaults against him.

2. *Lack of Progress in Treatment at the MTC Since 1984.* During the past 32 years, DiModica has made little, or no, progress toward potential release. In fact, the most recently issued Community Access Board (CAB) report, dated August 3, 2004, states as follows:

> "Mr. DiModica did not make any progress on the treatment
> goals recommended at his last review..." (8/3/04 CAB Report).

Remarkably, under the "Issues Remaining for Treatment" section of the most recent CAB Report, the following statement appears:

> "...The most pressing issue needing to be addressed <u>by Mr.
> DiModica</u> is his susceptibility to both internal and external
> motivation to act on impulse across many spheres of his

3

functioning. <u>Some form of functional analysis needs to be conducted in</u> order to identify the antecedents and reinforcers connected to his problematic/maladaptive behaviors. Priority should be given to first arresting those behaviors leading to sexual aggression and improper self-care. Once this behavior is understood, stabilized, and changed, other behaviors should be addressed, such as his relationship and communication skills. Special emphasis should be given to the building of skills in the area of identifying his own feelings and communicating them, as well as skills that will increase his ability to identify and appropriately respond to the feelings and communication of others. Mr. DiModica will be able to make better use of sex offender specific treatment if these issues are addressed." (Emphasis added).

(8/3/04 CAB Report).

Unfortunately, the CAB has never specified how these issues are to be addressed in the coming year, nor has the CAB explained why no progress has been made in these areas during the past 20 years; nor why "some form of functional analysis" has not been considered until now; nor why such an analysis has not been undertaken in 20 years. Rather, DiModica is described as an out-of control, sexually aggressive individual who fails to progress in their standardized treatment program.

A depressing scenario of victimization of DiModica and failure to address his specific needs has been reported throughout the years. Among these --:

- "Mr. DiModica's 'marginal participation in activities clearly reflects his minimal progress (if any) in treatment...Most of what he learn does not get integrated into his personality...He becomes confused easily and will quit if he feels he is being singled out... Although he is dependent on others, he will avoid help because he     fears they will want sex from him. He confuses issues and has little understanding of his offense..." (5/24/94 Annual Treatment Review).

4

- "Mr. DiModica reportedly told Qualified Examiner, Don Grief, Ph.D., in 1997 that he has difficulty resisting sex at the Treatment Center due to fear that if he did not comply he would be hurt." (Pierce, 2004, quoting Grief, 1997).

- "During the past year of treatment, Mr. DiModica made minimal progress in addressing his identified sex offender treatment issues. Although he increased his attendance rate, Mr. DiModica decreased the level and content of his participation as compared with the previous year of treatment. Although Mr. DiModica's cognitive limitations may impede his ability to understand the complex terminology utilized in the treatment program, even when the terminology is simplified, he continued to struggle to understand many concepts." (5/11/01 Annual Treatment Review).

- "[D]espite his level of participation, he struggled to understand important concepts as well s how the concepts apply to the victims of his sexual offenses. (Kelso, quoting group notes in 2000, 2001).

In 2001 and 2002, DiModica's participation in treatment increased significantly, due to a new method of treatment, Dialectical Behavioral Therapy (DBT). During this period, DiModica was credited with -- "excellent progress in his evolving understanding of his sexual offenses and factors which contributed to them. He has maintained perfect attendance in his Primary Group and integrates what he is learning in his psycho-educational course, "Clear Thinking About Sexual Assault," and a previous course, "Living in the Community," with the work he is doing in Primary Group." (CART Report, 11/27/01).

It was also noted that he discussed an intention to maintain his boundaries against unwanted sexual advances within the Treatment Center.

Unfortunately, this limited progress at the MTC was short-lived. When Sara Dubik-Unruh, M.S., the therapist who had utilized DBT, left the MTC, this avenue of progress was no longer offered to DiModica to any significant extent. After Ms. Dubik-Unruh left, DiModica's progress deteriorated, and DiModica was, again, blamed for his lack of progress, as the notations in the records continue:

- "Mr. DiModica has made no progress in the past year in this area of clinical focus." (Same assessment of no progress, referring to the major goals of the treatment program, including cognitive restructuring, identification of sexual assault cycle, relapse prevention, accountability and accepting responsibility, anger and stress management, victim empathy,

5

social skills training, adult life skills training, release planning). (3/21/02 Annual Treatment Review).

- "Mr. DiModica does not appear to have made progress during this review period. Some changes in staffing may have possibly disrupted his adherence to treatment, however, the changes also brought to light the extent of his lack of integration of the DBT skills he has learned over the past 2 years." (No progress noted in the major goals of the treatment program.) (4/18/03 Annual Treatment Review).

- "Mr. DiModica has not made any progress in treatment during this past review period...He has not worked on many clinical goals from his treatment plan and spends much of his time bringing up "here and now" issues when it is his turn to present in group sessions." (No progress noted in the major goals of the treatment program.) (4/5/2004 Annual Treatment Review).

3. *Clinical Formulation Upon Recent Testing.* Until requested by DiModica's attorney this year, no testing or diagnostic evaluation had been conducted in 20 years, not until the testing conducted by Barbara K. Schwartz, Ph.D.,[1] the former Clinical Director of the MTC, was undertaken by request of DiModica's attorney. Dr. Schwartz' evaluation (copy appended) concludes that DiModica is mildly retarded, with an I.Q. between 50-70. Like numerous others before her, she concludes as follows:

> "DiModica is not intellectually capable of engaging in the
> treatment offered at the Treatment Center. He has an extremely
> poor memory. He could not accurately tell how old he is, or
> where he was raised. He repeats his description of the offenses
> in a rote manner with little, if any insight or possibly real memory
> for the crimes or the events leading up to them...

---

[1] Dr. Schwartz has been engaged in the treatment and evaluation of sex offenders for the past 31 years. She has directed sex offender treatment programs for departments of correction in New Mexico, Washington State, and Massachusetts, as well as operating sex offender treatment programs in New Jersey and Missouri through her private company. She has consulted on sex offender treatment in over 30 states as well as in Canada and in Israel. Dr. Schwartz has been qualified as an expert in numerous states and has been retained to evaluate sex offender treatment programs in Kansas, Wisconsin, Washington State, and California. She is the author of numerous textbooks, utilized by experts in the field of sex offender treatment and evaluation. She has treated and/or evaluated more than 1,000 sex offenders, and supervised treatment of approximately 5,000 others. She was the Clinical Director of the Massachusetts Treatment Center from 1992-2002.

"It is highly unrealistic to imagine that this individual could ever devise a Relapse Prevention Plan or understand how motivators or disinhibitors dynamically relate to his offenses. He is not going to be able to profit from any therapy that relies on insight or understanding of the past to prevent future reoffending. For Mr. DiModica to be able to benefit from treatment, it needs to be in a supportive, highly structured environment where he can be taught appropriate responses and controls on a here-and-now basis. Mentally retarded sex offenders are currently being maintained in the community under close supervision and trained on techniques for controlling their behavior in actual situations.

"In addition, he is clearly hypersexual, reporting that he masturbates three times a day, when the cutoff for sexual compulsivity is five sexual outlets a week. The treatment for this condition is psychopharmacological, an intervention that is not used at the Treatment Center...

"When he was initially released from the Treatment Center, it was without having received treatment geared to his functional level, and he did not receive sex offender treatment or appropriate supervision while in the community. He is continuing to be made the target of sexual abuse by other residents, and his inherent role of victim is not being recognized.

Mr. DiModica needs to have a court-appointed guardian to help him with making decisions and protecting his rights. He also needs to be assisted in applying to the Massachusetts Department of Mental Retardation to have his case reopened so that he can

7

be considered for appropriate services." (Schwartz, August, 2004).

4. *Requested Action.* As demonstrated by the record notations cited in Paragraph 2 herein, DiModica has not progressed in the MTC's treatment program. He has remained untreated despite numerous expressed concerns that his needs cannot be addressed at the MTC. Rather than attend to his obvious needs, experts continue to evaluate him according to the same parameters applied to every sex offender and continue to conclude that he is sexually dangerous because **he** has not addressed these issues. The failure of the treatment program at the MTC to address DiModica's specific needs is described as **DiModica's** personal failure.

Some 32 years after his commitment, the CAB is suggesting that "some form" of functional analysis needs to be undertaken. The MTC has had 32 years to engage in this functional analysis, and has failed to do so. While it may be true that "Mr. DiModica will be able to make better use of sex offender specific treatment if these issues are addressed," as the CAB has stated in its most recent review, it is 31 years too late to be making such statements. If they have not already addressed these needs, they are not likely to do so without some qualified advocate knocking on the doors and rattling the cages.

If DiModica was civilly committed for treatment and rehabilitation, the Commonwealth has a responsibility to present treatment designed to meet his specific needs. An "indefinite commitment, pursuant to G.L. c. 123A may be upheld only so long as it is remedial and not penal." Commonwealth v. Page, 339 Mass. 313, 317-18 (1959). However, in the absence of proper, individualized treatment, that is, treatment designed to meet DiModica's specific needs, he is merely being warehoused in a prison. "Confinement in a prison which is undifferentiated from the incarceration of convicted criminals is not remedial so as to escape constitutional requirements of due process." *Id.* (See report of the Special Master appointed by Judge Mazzone in King v. Greenblatt : "irrevocable incarceration until the expiration of sentence would seem not to be related to safety but to punishment." Dec. 21, 1992 Report at 6-7). (Also see Jackson v. Indiana, 406 U.S. 715, 738 (1972) "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").

It is appropriate that the Court having jurisdiction over a petition for release also examine the conditions of confinement and whether or not all has been done to address the least restrictive alternative appropriate to the petitioner of that petition for release. ("The purpose of an SDP hearing is to find the best

8

disposition available under the statute, with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him. [Where in a proceeding under G.L. c. 123A, sec. 1, evidence was offered with respect to placing the defendant in a particular treatment program as an alternative to the Bridgewater Treatment Center, but the judge made no findings with respect to any alternative placement, the case was remanded for the limited purpose of securing an explicit determination whether there was a feasible and better alternative to Bridgewater.] Commonwealth v. Jose Rodriguez, 376 Mass. 632, 645-46 (1978). (Also: "Because this issue is likely to recur at the rehearing of this matter, we rule upon the only other exception argued by the defendant. This relates to the judge's exclusion of questions addressed to psychiatrists by defense counsel concerning the treatment available at the Bridgewater Treatment Center for this defendant. These questions should have been admitted. They were relevant to the issue of the appropriate disposition of the case among the several alternatives provided by the statute, which included commitment to the Bridgewater Treatment Center. Commonwealth v. Blasda, 362 Mass. 539, 542 (1972); (Also see Commitment of K.D., Superior Court of New Jersey, Appellate Division, January 22, 2003. "We conclude that the court has the inherent power to examine conditions of confinement, including treatment... ").

During commitment, DiModica is entitled to "adequate and appropriate treatment." and consideration whether a less restrictive alternative is available. Commonwealth v. Nassar, 380 Mass. 908, 917-918 (1980); D.L. v. Commissioner of Social Services, 412 Mass. 558, 591 (1992); Doe v. Doe, 377 Mass. 272, 277 (1979); Commonwealth v. Rosenberg, 410 Mass. 347, 360 (1992) (due process right to treatment), etc.   The Commonwealth has failed to locate, or even to investigate treatment options. DiModica is entitled to training appropriate to ensure his ability to function free from restraint. Youngberg v. Romeo, 457 U.S. 307, 324, 102 S.Ct. 2452 (1982); Baxstrom v. Herold, 383 U.S. 107 (1966). The Commonwealth had the option (and, indeed, an obligation) to provide such training, but chose not to do so.

The Commonwealth's failure to address DiModica's treatment needs is proper cause for his release from civil confinement.  At this juncture, DiModica is seeking a reasonable alternative to that action. Failing the granting of the requested relief, he should, rather, be released from his civil commitment and from custody. To do otherwise, would violate DiModica's right to due process of law and equal protection rights pursuant to the Fourteenth Amendment of the United States Constitution as well as Article 12 of the Massachusetts Declaration of Rights, as well as his rights under Articles 1, 10, 12, 24 and 26 of the

9

Massachusetts Declaration of Rights, and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

Based upon the facts presented herein, DiModica, through counsel, moves the Court to order the appointment of Dr. Schwartz, or such other competent expert, as his guardian, to advocate on his behalf and ensure that proper services are provided. It is further requested that this matter be continued and remain within the jurisdiction of the Superior Court, so that the matter may be monitored from time to time, as may become necessary.

Respectfully submitted,
By his attorney,

Sondra H. Schmidt
BBO #551957
Post Office Box 174
Hingham, MA 02043
Telephone: (781) 383-1245

Dated: September 9, 2004

### CERTIFICATE OF SERVICE

On September 9, 2004, I hereby certify that I served notice of the within Motion the Commonwealth, by causing to be sent a true and exact copy to counsel of record, Attorney Mary Murray, at the Massachusetts Treatment Center, via facsimile transmission (508-279-8181).

Sondra H. Schmidt
BBO #551957
P.O. Box 174
Hingham, MA 02043
Telephone: 781-383-1245

10

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT OF THE
TRIAL COURT OF THE COMMONWEALTH
DOCKET NO. 98-1469

MIDDLESEX, ss.
(UNIFIED SESSION)

DOMINIC DI MODICA,
      Petitioner

v.

COMMONWEALTH OF MASSACHUSETTS,
      Respondent

Order

  After hearing, it is hereby ordered that Barbara K. Schwartz, Ph.D., be appointed as guardian/advocate for Dominic DiModica. Such services shall be paid from Committee for Public Counsel funds.

  This Court retains jurisdiction of this matter. Either party may bring issues related to DiModica's treatment before the Court for hearing.

                ,J.
            Associate Justice of the Superior Court

11