**Paul D. Zeizel, Psy.D.**
1101 Beacon Street, Suite 8E
Brookline, MA 02446
ph:  617.731.4300

Brief Psychodiagnostic Evaluation

**Name:**  Dominic DiModica
**Date of Birth:**  9/14/50
**Age:**  57
**Date of Evaluation:**  4/7/07
**Date of Report:**  5/7/07
**Evaluator:**  Paul D. Zeizel, Psy.D.


**Brief Identifying Data:**

Mr. DiModica was born in Somerville, MA the older of two brothers.  He informed this examiner that he is close with his brother (Tony) and his parents.  It was noted in Mr. DiModica's CAB report dated 2004 that he had a psychosocial condition that resulted in cognitive limitations.  Intellectual testing at the Somerville Guidance Center indicated Mr. DiModica met the criteria to be classified with a diagnosis of Mental Retardation, mild to borderline range.

It was also noted in the CAB report dated August 3, 2004 the following, "While on a form of court ordered conditional release from the Treatment Center (receiving services from Danvers State Hospital and Department of Mental Retardation (DMR), Mr. DiModica participated in some services at a pre-vocational workshop from November 1981 to April 1982.  From May to October 1982, he was in a job transition workshop run by Morgan Memorial.  In November 1982 to June 1983 Mr. DiModica was permitted to go out and look for work without the assistance of his treatment/training staff.  He worked for one week as a dishwasher at a local college, but fired following an emotional outburst.  From August to December 1983, he returned to the pre-vocational workshop.

A  report from the Cambridge Somerville Mental Health Mental retardation Center in Cambridge, Massachusetts dated August 1970 is quoted as stating that his parents "have been confused and inconsistent in their discipline of Domenic.  They seem to have used mental retardation as an excuse for his unacceptable behavior, and treated him with an attitude that was more permissive than protective than would be used on non-retarded children."   When Mr. DiModica's behavioral difficulties became more prominent, his parents frequently expressed their frustration with Mr. DiModica's service providers and the overall mental health/mental retardation system, rather than Mr. DiModica.  Attempts to provide support and guidance to Mr. DiModica's parents was frequently met with resistance (missed appointments, poor communication with service providers, refusal of services)."

Various testing in different settings universally noted Mr. DiModica's cognitive limitations. "Mr. DiModica's medical history includes the early diagnosis of physiological and cognitive delays and deficits. He had surgery for an undescendent (sic) testicle between the ages of nine and twelve, and received hormone treatments for nine months subsequent to the surgery. (Admission Summary, p.2). In May 1971, he was diagnosed with "mental retardation, borderline pedophilia" while a patient at Westboro State Hospital. In August of 1971, after admission to Bridgewater State Hospital, he was diagnosed with "mental deficiency, I.Q. 62, mild to moderate (mental retardation) with sexual deviation." (Admission Summary, pp. 2-3).

There are no clear reports of substance abuse in Mr. DiModica's records.

Mr. DiModica's criminal history consists solely of sexual offenses which are reviewed directly below."

"As noted in the above sections of this report, Mr. DiModica was born with a neuro-developmental disorder that has caused impairments in his intellect/cognitive functioning, and subsequently, impairments in the development of his personality. The descriptive information contained in his Treatment Center records regarding his neuro-developmental condition paints only a gross or general view of the problem – "primary simple oligophrenia" also described in the records as "microcephalia." The impact of this condition, along with some environmental influences, has directly impacted Mr. DiModica intellectual/cognitive development and the acquisition of successful adaptive behaviors. It is very likely that, as in the case of his low level of intellectual functioning/cognitive abilities, there are anatomical abnormalities correlated with Mr. DiModica's history of violent and inappropriate sexual behaviors. What role and to what degree these abnormalities impacted his behavior is unclear. Damage and malfunction in various regions of the brain are frequently observed to lead to violent acts. Similarly, impairments in cognitive capacities (due to damage or dysfunction) can also contribute to impulsive and compulsive behaviors, a diminished capacity to learn from past experiences, as well as diminished capacity to regulate and modulate emotional states."

Mr. DiModica had been in the community in a supervised setting from 1980 to 1984 when re-offended against a 22-year-old developmentally disabled woman. In a review of a report written by Dr. Donald L. Round on June 19, 2006, it was noted that Mr. DiModica had a full scale I.Q. of 61 on the WAIS-3, with a verbal I.Q. of 68 and a performance I.Q. of 78. Mr. DiModica "fully meets the criteria for a diagnosis of mild mental retardation." Additionally it was felt that Mr. DiModica failed to attain a level of adaptive behavior for day-to-day activities.

Mr. DiModica was committed to the Massachusetts Treatment Center on April 24, 1972, in lieu of a criminal sentence, following his conviction on charges of indecent assault on a three-year-old child. He was then placed at Danvers State Hospital in 1980 and transitioned to a residential program. He returned to the MTC in 1984 after a sexual Assault on a 32-year-old mentally retarded woman.

The undersigned was requested by Attorney Jennifer Serafyn of Seyfarth and Shaw, World Trade Center East, Two Seaport Lane, Boston, MA 02210 to examine Mr. DiModica, review his records and provide a treatment plan for Mr. DiModica given the Developmental Disability he has, namely Mental retardation, Mild Type.

Given that Mr. DiModica meets DSM-IV – T.R. classification of mental retardation, he therefore would be eligible for services from the Department of Mental Retardation. Mr. DiModica would then receive services that would both address the intellectual limitations and skill deficits and guarantee protection of both Mr. DiModica and the community.

There is no single "right" way to provide services for Mr. DiModica. Research supports an individualized service plan for Mr. DiModica. He would certainly need to have a full time residential program that has a therapeutic milieu oriented to sex offender treatment. The release prevention model paired with eventual opportunities to have in-vivo experiences in the community would be appropriate. Mr. DiModica was last in the community in 1984, 23 years ago when he re-offended. Research on age and recidivism indicates that as one ages through the life span risk to re-offend reduces. Actuarial data suggests that Mr. DiModica is at less of a risk of re-offending in 2007 compared to 1984. If Mr. DiModica were provided services by DMR, the graded exposure to the community in a linear manner would occur – protecting both Mr. DiModica and the community. There are known vendors with DMR that can provide a secure treatment environment, and maximize the likelihood that behavioral changes will occur. Mr. DiModica needs both a stable holding environment such as a secure group residence, in a locked facility 24 hours / day, 7 days / week. He would benefit from a therapeutic community paired with pharmacological intervention. Mr. DiModica's treatment should also consist of cognitive – behavioral treatment, social skills training, including stress inoculation, self-regulation strategies. This model would place emphasis on skill acquisition and problem solving helping Mr. DiModica manage his arousal and self-regulation. Treatment would be presented in a manner that is oriented so that an individual with significant cognitive limitations would understand. This would be a multi-method model dealing with treatment needs, (including empathy training, anger management, cognitive restructuring, covert sensitization, etc.) and risk appraisal. Mr. DiModica would have a specific service coordinator assigned to him from DMR to help link all the services for Mr. DiModica across all domains. This would be a conduit to provide the least restrictive environment for Mr. DiModica and also protect the community.

Respectfully submitted,

Paul D. Zeizel, Psy.D.,