# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DOMINIC V. DiMODICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 05-10286-PBS |
| v. | ) | |
| | ) | |
| ROBERT MURPHY, KATHLEEN | ) | |
| DENNEHY, and the MASSACHUSETTS | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S EXPERT DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 26(a)(2), Plaintiff Dominic V. DiModica ("Plaintiff" or "Mr. DiModica") hereby provides this expert disclosure statement and states that he expects to call Dr. Paul D. Zeizel, Psy.D. ("Dr. Zeizel"), to offer expert testimony relating to Mr. DiModica's psychodiagnostic evaluation and the issues concerning an appropriate treatment plan specifically geared toward Mr. DiModica's functional cognitive level, including:

(i) the need for sex offender treatment providers who are properly trained in the treatment of mentally disabled individuals; and

(ii) the need to provide Mr. DiModica with a coherent and meaningful individualized treatment program designed specifically for mentally disabled individuals.

Plaintiff further states as follows:

1.  Mr. DiModica is civilly committed and is housed at the Nemansket Correctional Center ("Treatment Center") in Bridgewater, Massachusetts.

2.    Dr. Zeizel is a forensic psychologist in Brookline, Massachusetts.  A copy of his curriculum vitae which includes a list of his presentations, publications, awards and memberships is attached hereto as <u>Exhibit A</u>.

3.    On two separate occasions, Dr. Zeizel performed psychodiagnostic evaluations of Mr. DiModica.  Attached hereto as <u>Exhibits B and C</u> are Dr. Zeizel's reports relating to his evaluations of Mr. DiModica.  In addition to personally meeting with and evaluating Mr. DiModica, Dr. Zeizel reviewed extensive medical records and information pertaining to Mr. DiModica.  Dr Zeizel's reports (Exhibits B and C) therefore prescribe an appropriate treatment plan for Mr. DiModica.  A supplement report by Dr. Zeizel will be submitted in early April, 2008.

4.    Dr. Zeizel will provide an expert opinion concerning his evaluations and proposed treatment plan for Mr. DiModica.

5.    Dr. Zeizel will be compensated at a rate of $200 per hour for his services, some of which will be paid by funds set aside by the Court.

Plaintiff further reserves the right to supplement this Disclosure Statement in the event that further information is discovered or obtained in any supplemental treatment records or evaluations.

DOMINIC V. DiMODICA,

By his attorney,

 /s/ Erin S. Martino
Erin S. Martino (BBO #658100)
Seyfarth Shaw LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:  (617) 946-4800
Facsimile:   (617) 946-4801

Dated: February 21, 2008

2

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 21, 2008.

 /s/ Erin S. Martino
Erin S. Martino

# Curriculum Vitae

## PAUL D. ZEIZEL

**Permanent Address:**

529 Ward Street
Newton, MA 02459
(617) 965-8191

**Office Address:**

1101 Beacon St, Ste. 8E
Brookline, MA 02446
(617) 731-4300

## Educational Background:

1981 - 1987   Massachusetts School of Professional Psychology, Psy.D.
Clinical Psychology

1978 - 1979   Harvard University
Graduate School of Education
Ed.M.
Majority of coursework in Psychology and Social Relations.

1977 - 1978   Boston University Graduate School
Counselor Education Department
Humanistic - Existential Team
Ed.M.

1973 - 1977   Queens College
City University of New York
B.A. Magna Cum Laude

1974 - 1975   University of Leeds, England
Visiting Student

## Work Experience:

1994 -current   Sovner Center - a program of Bridgewell
Clinical Director
65 Newbury Street
Danvers, MA 01923
Evaluations and treatment of Forensic Patients:
.Team Leader in Clinical Case Conference and Risk Management meetings
.Supervise and train psychology graduate students
.Supervise Master's level clinicians

1986 -current   Forensic Consultant (appointed by Department of Correction as Qualified Examiner to
examine and make recommendations pertaining to Sexual Dangerousness, M.G.L.,
Chapter 123A, Section 1, 12, 13, and 9.)
Probate and Family Courts, Norfolk and Newton
District Courts, East Boston, Roxbury, Malden, Newton
Juvenile Court, Boston
US Federal Courts
Superior Court, Suffolk County, Middlesex County, Plymouth County, and Essex County
to testify at Section 9, Section 13A, probable cause hearings

Qualified as an independent expert examiner to evaluate and testify on Sec. 9 cases (Sexually Dangerous Person) in Superior Court, Middlesex, Suffolk, Plymouth and Essex, Worcester, Hampden, Norfolk Counties. Over 400 trials
.Perform psychodiagnostic evaluations
.Provide expert testimony for disability, trauma, and psychopathology
.Consultant to District Attorney's Offices – multiple counties – Sexually Dangerous Person's Law
.Investigate and make recommendations regarding child custody, care, and protection, and criminal responsibility, and competency
.Fulfill court appointments as Guardian ad litem
.Petition for Section 18(a) transfers to psychiatric facilities
.Evaluations and court testimony in front of Sex Offender Registry Board

1997 - 1998    Tri-City Mental Health and Retardation Center, Inc.
61 Boston Avenue
Medford, MA 02155

Hired by DSS to provide sexual offender and sexual abuse evaluation for clients and families of DSS. Evaluations include psychodiagnostic assessment and reports for court testimony.

1990 - 1993    Assistant Chief of Mental Health
Suffolk County House of Correction, Boston, MA
Develop and direct mental health services and sophisticated suicide prevention program for 1200 male and female inmates.
.Train doctoral and medical students affiliated with Massachusetts General Hospital — Law and Psychiatry Department
.Conduct in-service education modules for medical and corrections staff
.Evaluate inmates for parole
.Conduct research study on stalkers and violators of restraining orders
.Provide 24 hour emergency on-call coverage
.Evaluate level of dangerousness for inmates

1988 -current    Private Practice in Cognitive-Behavioral Psychotherapy
1101 Beacon Street, Suite 8E
Brookline, MA 02446

1985 – 1993    Association for the Advancement in Behavioral Sciences
Westlake, CA

Part-time instructor in psychology licensing review course

1987 -current    Newton-Wellesley Hospital
2014 Washington Street
Newton, MA 02465

Providing supervision to Post-Doctoral trainees in Cognitive-Behavioral Psychology and Inpatient Evaluation of O.C.D./Anxiety Disorders

1993 -current    Office of Medical Services
Central Intelligence Agency

Washington, DC 20505

Supplemental Care Provider with Employee Assistance Program

1981 - 1988    Behavior Associates of Boston
45 Newbury Street
Boston, MA 02116

Psychology assistant in group private practice.
Individual and group treatment of adults in outpatient setting using Behavior Therapy
Behavioral consultant to Metropolitan State Hospital, Cambridge-Somerville Unit
Specialization in Behavioral Medicine, agoraphobia, and anxiety disorders

1984 - 1985    Behavioral Medicine Center of New England
54 Hopedale Street
Hopedale, MA

Pre-Doctoral Internship in outpatient practice.
Individual psychotherapy; Psychological testing and staff training at Milford-Whitinsville
Hospital. Training included stress management, workshops to Nursing Department on
Behavioral Strategies with difficult patients. Consulting and admitting privileges at
Milford-Whitinsville Hospital

1979 - 1981    Wrentham State School
Psychology Department
P.O. Box 144
Wrentham, MA

Principal Supervising Psychologist assuring the delivery of quality psychological services
through staff training, supervision and direct counseling and psychological testing for
clients. Provided cognitive assessments and behavioral management plans for specific
clients. In charge of delivery of psychological services to 100 developmentally disabled
clients. Supervised Boston College students -- M.A. level

1980, Fall    Fisher Junior College Instructor
Boston, MA

1977 - 1978    Somerville Mental Health Center
63 College Avenue
Somerville, MA

Psychology Intern, providing long- and short-term psychotherapy with children and adults,
and group therapy with children and adolescents.

1975 - 1977    Oz Counseling Center
153-07 61st Road
Flushing, NY

Counselor for members of the College community, coordinator of staff meetings and
participants in the training of new staff.

1976        New York University Medical Center
            Institute of Rehabilitation Medicine
            400 East 34th Street
            New York, NY

            Awarded fellowship in Health Services. Learned how therapy was provided to disabled
            patients. Attended Grand Rounds.

1975        Lifeline Center for Child Development
            84-74 169th Street
            Jamaica, NY

            Teacher of Emotionally Disturbed Children

## Presentations:

November 2006, Guest Lecturer, Tabor Academy, Forensic Psychology "Risk Assessment of
   Dangerousness" to Psychology classes

September 2004 – 2005, Massachusetts Professional Psychology, Field Placement Supervisor for School
   Profession Psychology provided clinical supervision and forensic training of fourth year doctoral
   student

December 2005, Hua Hin, Thailand, Consultation to real estate development company, partnership with
   Ministry of Children to discuss development and planning of women and children's shelter who've been
   trafficked and sexually exploited in commercial sex trade

December 2005, Consultant to Sok Sabay, Phnom Penh, Cambodia – Requested by United States
   Embassy to informally consult to residential shelter, training of staff and providing psychodiagnostic
   evaluation of children rescued from situations of enslaved prostitution, violence, abandonment and
   slavery.

May 2004, Guest Lecturer, Newton North High School: "Law and Psychology" – Forensic Evaluation

September 2004 – Training seminar, Forensic Psychology Evaluations and Treatment

June 2002, Consultant to New Jersey Protection and Advocacy, Trenton New Jersey, Attorney General's
   Office – involved in Federal law suit for six developmentally disabled individuals with sex offender
   history to recommend appropriate treatment paradigms for individuals who will be transitioned from
   institutional setting to the community, additionally, working with developmentally disabled arsonists
   who set fires which resulted in the loss of life.

October 2001, Training, "Dealing with Post Traumatic Stressors of 9/11" - GLMH

June 1999, Key note speaker for the Department of Mental Retardation, State of Washington, Ellensberg
   Annual Conference on Sex Offender Treatment for the Developmentally Disabled

Winter, 1999, Key note speaker "Sex Offenders and Treatment," Seattle, Washington, Department of
   Mental Retardation

Lecturer for Commonwealth Educational Seminars: Cape Cod, Braintree, Warwick, RI, on "Recent
   Advances in Anxiety Disorders", 1994.

Center for Disease Control, September, 1992 – April, 1993, Course work in dealing with spread and
   treatment of HIV/AIDS in a public health and mental health paradigm

Psychological Evaluation for Massachusetts State Police for Fitness of Duty for 270 police academy
   cadets, 1993

Seminar presented on "Treatment of Panic Disorder", Lynn Hospital, 1993.

Seminar presented on "Nature and Treatment of Anxiety Disorders", Baldpate Hospital, 1993.

Behavioral Intervention with the Mentally Retarded, Atlanti-Care Hospital, Lynn, Spring 1990.

Staff Training on Learning Theory, Massachusetts Osteopathic Hospital, Fall 1989.

Cognitive-Behavioral Therapy Seminars, 10 weeks, to post-graduate

students and Newton-Wellesley Hospital, Spring 1989.
Borderline Personality Disorder, Department of Mental Retardation, Spring 1989.
Treatment of Sexual Offending, Department of Mental Health, Fall 1988
Training in Cognitive Behavior, Psychology Treatment of Depression,
    Staff of Vietnam Veteran's Center, Veterans Administration, Winter 1986; Spring 1987.
Presentation to Massachusetts Psychology Association, Cognitive-
    Behavioral Therapy in Groups; Agoraphobia Therapy Group, Fall 1985.
Consultation in Behavioral Medicine to Dorchester Mental Health Clinic, 1985.
Stress Management Workshop, Milford Dailey News, June 1985.
Behavioral Medicine Treatment of Chronic Pain, Visiting Nurses Association, June 1985.
Biofeedback and Treatment of Migraine Headache, Massachusetts General
    Hospital, Neurology Department, May 1985.
Diagnosis and Treatment of Agoraphobia, Workshop at Neponset Mental
    Health Center, six-week training program, Spring 1984.
Seminar presented on "Nature and Treatment of Phobic Disorders", Arbor Hospital, Fall 1982.
Seminar presented on "Stress" to Psychology Department, Wrentham State School, Winter 1980.

## Awards and Acknowledgements:

December 2006 – Retained Expert, Military Court Martial, United States Coast Guard, First District Legal
    Office, Atlantic Avenue, Boston, Massachusetts, retained by Coast Guard Expert Witness in Military
    Court Martial for a Sexual Offending Coast Guard Officer
Training in the use of the Hare Psychopathy Checklist-Revised – September of 2006
Consulting Psychologist with staff privileges, Newton-Wellesley
    Hospital, Department of Psychology, Newton, MA.
Consulting Psychologist with staff privileges, Baldpate Hospital,
    Georgetown, MA.
Intensive training in Biofeedback Instrumentation, Boston University
    Medical Center, August 1983.
Certified to administer, score and interpret WAIS, WISC, WIPPSI,
    Stanford-Binet Intelligence Tests and MMPI.
DeWitt Wallace Fellowship (N.Y.U. Medical Center)
Magna Cum Laude, Queens College, 1977.
December, 1999, Key note presenter "Sex Offenders in Treatment", Seattle, Washington, Department of
    Mental Retardation

## Memberships (Past and Current):

Association for the Treatment of Sexual Abusers (ATSA) – full member
American Psychological Association
Association for the Advancement of Behavior Therapy
Massachusetts Psychological Association
American Board of Forensic Examiners - full member

## Publications:

P. Zeizel, Ed.M., Raynolds, M.A., M.Ed.
Test Taking Skills Seminar -- a guide to reducing test anxiety in college.
P. Zeizel, Psy.D. -- Home Relaxation Practice and Bronchial Asthma.

Licensure: Licensed to practice psychology as a psychologist in the Commonwealth of Massachusetts.

References will be furnished upon request.

## Extracurricular:

. Finalist, New York City High School outdoor track and field championship mile relay, 1973
. University of Leeds basketball team – 1974, 1975
. Marathon running
. Youth coach, Boston Athletic Association since 1996 – present
. Youth basketball coach
. Youth soccer coach
. Member of Board of Directors, Newton Girls' Basketball Association
. Dana Hall Girls' School, Wellesley, MA - Cross-country coach – 1998, 1999
. Adventure travel – Atlas Mountain, Morocco, Laos, Burma, Cambodia, Thailand

## Paul D. Zeizel, Psy.D.
1101 Beacon Street, Suite 8E
Brookline, MA 02446
ph: 617.731.4300

### Brief Psychodiagnostic Evaluation

**Name:** Dominic DiModica
**Date of Birth:** 9/14/50
**Age:** 57
**Date of Evaluation:** 4/7/07
**Date of Report:** 5/7/07
**Evaluator:** Paul D. Zeizel, Psy.D.

**Brief Identifying Data:**

Mr. DiModica was born in Somerville, MA the older of two brothers. He informed this examiner that he is close with his brother (Tony) and his parents. It was noted in Mr. DiModica's CAB report dated 2004 that he had a psychosocial condition that resulted in cognitive limitations. Intellectual testing at the Somerville Guidance Center indicated Mr. DiModica met the criteria to be classified with a diagnosis of Mental Retardation, mild to borderline range.

It was also noted in the CAB report dated August 3, 2004 the following, "While on a form of court ordered conditional release from the Treatment Center (receiving services from Danvers State Hospital and Department of Mental Retardation (DMR), Mr. DiModica participated in some services at a pre-vocational workshop from November 1981 to April 1982. From May to October 1982, he was in a job transition workshop run by Morgan Memorial. In November 1982 to June 1983 Mr. DiModica was permitted to go out and look for work without the assistance of his treatment/training staff. He worked for one week as a dishwasher at a local college, but fired following an emotional outburst. From August to December 1983, he returned to the pre-vocational workshop.

A report from the Cambridge Somerville Mental Health Mental retardation Center in Cambridge, Massachusetts dated August 1970 is quoted as stating that his parents "have been confused and inconsistent in their discipline of Domenic. They seem to have used mental retardation as an excuse for his unacceptable behavior, and treated him with an attitude that was more permissive than protective than would be used on non-retarded children." When Mr. DiModica's behavioral difficulties became more prominent, his parents frequently expressed their frustration with Mr. DiModica's service providers and the overall mental health/mental retardation system, rather than Mr. DiModica. Attempts to provide support and guidance to Mr. DiModica's parents was frequently met with resistance (missed appointments, poor communication with service providers, refusal of services)."

Various testing in different settings universally noted Mr. DiModica's cognitive limitations. "Mr. DiModica's medical history includes the early diagnosis of physiological and cognitive delays and deficits. He had surgery for an undescendent (sic) testicle between the ages of nine and twelve, and received hormone treatments for nine months subsequent to the surgery. (Admission Summary, p.2). In May 1971, he was diagnosed with "mental retardation, borderline pedophilia" while a patient at Westboro State Hospital. In August of 1971, after admission to Bridgewater State Hospital, he was diagnosed with "mental deficiency, I.Q. 62, mild to moderate (mental retardation) with sexual deviation." (Admission Summary, pp. 2-3).

There are no clear reports of substance abuse in Mr. DiModica's records.

Mr. DiModica's criminal history consists solely of sexual offenses which are reviewed directly below."

"As noted in the above sections of this report, Mr. DiModica was born with a neuro-developmental disorder that has caused impairments in his intellect/cognitive functioning, and subsequently, impairments in the development of his personality. The descriptive information contained in his Treatment Center records regarding his neuro-developmental condition paints only a gross or general view of the problem – "primary simple oligophrenia" also described in the records as "microcephalia." The impact of this condition, along with some environmental influences, has directly impacted Mr. DiModica intellectual/cognitive development and the acquisition of successful adaptive behaviors. It is very likely that, as in the case of his low level of intellectual functioning/cognitive abilities, there are anatomical abnormalities correlated with Mr. DiModica's history of violent and inappropriate sexual behaviors. What role and to what degree these abnormalities impacted his behavior is unclear. Damage and malfunction in various regions of the brain are frequently observed to lead to violent acts. Similarly, impairments in cognitive capacities (due to damage or dysfunction) can also contribute to impulsive and compulsive behaviors, a diminished capacity to learn from past experiences, as well as diminished capacity to regulate and modulate emotional states."

Mr. DiModica had been in the community in a supervised setting from 1980 to 1984 when re-offended against a 22-year-old developmentally disabled woman. In a review of a report written by Dr. Donald L. Round on June 19, 2006, it was noted that Mr. DiModica had a full scale I.Q. of 61 on the WAIS-3, with a verbal I.Q. of 68 and a performance I.Q. of 78. Mr. DiModica "fully meets the criteria for a diagnosis of mild mental retardation." Additionally it was felt that Mr. DiModica failed to attain a level of adaptive behavior for day-to-day activities.

Mr. DiModica was committed to the Massachusetts Treatment Center on April 24, 1972, in lieu of a criminal sentence, following his conviction on charges of indecent assault on a three-year-old child. He was then placed at Danvers State Hospital in 1980 and transitioned to a residential program. He returned to the MTC in 1984 after a sexual Assault on a 32-year-old mentally retarded woman.

The undersigned was requested by Attorney Jennifer Serafyn of Seyfarth and Shaw, World Trade Center East, Two Seaport Lane, Boston, MA 02210 to examine Mr. DiModica, review his records and provide a treatment plan for Mr. DiModica given the Developmental Disability he has, namely Mental retardation, Mild Type.

Given that Mr. DiModica meets DSM-IV – T.R. classification of mental retardation, he therefore would be eligible for services from the Department of Mental Retardation. Mr. DiModica would then receive services that would both address the intellectual limitations and skill deficits and guarantee protection of both Mr. DiModica and the community.

There is no single "right" way to provide services for Mr. DiModica.  Research supports an individualized service plan for Mr. DiModica.  He would certainly need to have a full time residential program that has a therapeutic milieu oriented to sex offender treatment. The release prevention model paired with eventual opportunities to have in-vivo experiences in the community would be appropriate.  Mr. DiModica was last in the community  in 1984, 23 years ago when he re-offended.  Research on age and recidivism indicates that as one ages through the life span risk to re-offend reduces. Actuarial data suggests that Mr. DiModica is at less of a risk of re-offending in 2007 compared to 1984. If Mr. DiModica were provided services by DMR, the graded exposure to the community in a linear manner would occur – protecting both Mr. DiModica and the community. There are known vendors with DMR that can provide a secure treatment environment, and maximize the likelihood that behavioral changes will occur.  Mr. DiModica needs both a stable holding environment such as a secure group residence, in a locked facility 24 hours / day, 7 days / week.  He would benefit from a therapeutic community paired with pharmacological intervention.  Mr. DiModica's treatment should also consist of cognitive – behavioral treatment, social skills training, including stress inoculation, self-regulation strategies.  This model would place emphasis on skill acquisition and problem solving helping Mr. DiModica manage his arousal and self-regulation. Treatment would be presented in a manner that is oriented so that an individual with significant cognitive limitations would understand.  This would be a multi-method model dealing with treatment needs, (including empathy training, anger management, cognitive restructuring, covert sensitization, etc.) and risk appraisal.  Mr. DiModica would have a specific service coordinator assigned to him from DMR to help link all the services for Mr. DiModica across all domains.  This would be a conduit to provide the least restrictive environment for Mr. DiModica and also protect the community.

Respectfully submitted,

Paul D. Zeizel, Psy.D.,

**Paul D. Zeizel, Psy.D.**
**1101 Beacon Street, Suite 8E**
**Brookline, MA 02446**
**(617) 731-4300**

## Psychological Treatment Plan for a Developmentally Disabled Sex Offender

Name:  Dominic Dimodica
Date of Birth:  9/14/50
Age: 57
Date of Report: 8/26/07
Name of Examiner:  Paul D. Zeizel, Psy.D., Licensed Psychologist

This is a follow-up to a meeting with Massachusetts Treatment Center chief legal counsel Mary Murray, Attorney Mark J. Gillis and Attorney Jennifer Serafyn. Attorneys Murray, Gillis, Serafyn and this examiner met to discuss how Mr. Dimodica's treatment needs might be met to aide him in reducing his risk of sexual dangerousness while learning and benefiting from treatment in a manner that enables him to understand and benefit by this treatment in the least restrictive environment.  Mr. Dimodica has special needs and appears to meet the criteria of mental retardation, according to the DMR guidelines.  Mr. Dimodica has a Full Scale IQ of 61 with a Verbal IQ of 68 and a Performance IQ of 78.

The design of a program must be robust enough to enable Mr. Dimodica to benefit from treatment.  At the same time, if he were not to be housed at the Massachusetts Treatment Center and therefore placed in the community, the program would need to be secure enough to insure the protection of the community.

For an individual to be diagnosed with mental retardation, there is more than simple cognitive impairment.  The additional criteria include adaptive functioning, social functioning, level of emotional maturity, and the presence of other disabilities, most notably, communications.  This describes Mr. Dimodica.

Mr. Dimodica suffered a fair amount of psychosocial deprivation during his childhood and adolescence and he also exhibited a range of behavioral problems.  He has clearly demonstrated under-socialization, poor internal controls and poor faulty social learning.  This was only compounded by educational underachievement and poor social occupational skills.

Studies of sex offenders with mental retardation in both adult and adolescent populations show significant differences from non-retarded sex offenders (Day, 1994, 1997, Gilby, Wolf, and Goldberg, 1989). Individuals with mental retardation show a far greater spread of offense-type offending against males and females, and adults and children. A relapse prevention model is considered to be quite helpful both in research literature as well as in the clinical domains.

In dealing with intellectually disabled sexual offenders, it is noted that for treatment to be effective, the treatment has to be indeed quite specific for the individual. The best practice approach gathered by the responsivity principle is that it is imperative to provide therapeutic interventions and appropriate and effective treatment that is broken down into simple, understandable cognitive components like Mr. Dimodica to understand. The relapse prevention model which is based on the principles of social learning theory describes causal and maintaining factors as sustained behavior. The relapse prevention model for Mr. Dimodica would detail both cognitive and behavioral interventions as well as lifestyle changes (no different than the model used at the Treatment Center for non-intellectually limited offenders). A model that would be appropriate for Mr. Dimodica would be a self-regulation model of relapse prevention. This model is a process where internal and external events and thoughts allow and motivate an individual to engage in positive, goal-oriented behavior. The goals would be described as cognitive structures that could be stored with treatment staff providers. This would allow Mr. Dimodica to learn, retain and recall the positive strategies that he would use to remain safe in the community. The goal of self-regulation generally would be that he would either want to avoid certain situations or goals that he would want to achieve. Self-regulation involves the suppression of problematic behavior but also the enhancement and maintenance of positive emotional states and behavior. It is that goal of positive emotional states and behaviors that is a meaningful concept that helps direct the self-regulatory behavior. It is this examiner's belief that positive behaviors are generally the models that are used in DMR group facilities. This model would postulate that Mr. Dimodica would be able to identify his thoughts, feelings and behaviors which would be considered maladaptive. He then would be able to work on controlling his behavior. This would be paired with various treatment strategy elements.

Relapse prevention models have been introduced into treatment programs for intellectually disabled individuals. Developmentally disabled individuals often have poor self-regulation skills across all domains as well as deficits in social problem solving skills. Individuals like Mr. Dimodica are often avoidant and passive and they also have lower efficiency expectations in dealing with other individuals. The type of offending that often occurs with intellectually disabled individuals is characterized by impulsivity and poor behavior rather than inherent sexual deviancy. This may even be the case for Mr. Dimodica.

Individuals with intellectual disabilities also have a lack of insight. Lack of insight is often linked in a way where an individual is unable to foresee the consequences of his chosen course of action. Therefore, in dealing with the intellectually disabled sexual offender, positive self-statements oriented towards healthful activities in the community and positive self-regard and an increase in self-esteem can be utilized to help Mr. Dimodica. Mr. Dimodica would learn strategies that would most likely be therapeutic and effective in a behavioral script. This is to say that there would be a modeling event that would occur. Mr. Dimodica would follow the behavioral scripts with "*over-learning*." In other words, Mr. Dimodica would not most likely, in this examiner's understanding, be able to maintain control simply on a one-trial learning. Least restrictive learning, repeating the script and the situational and environmental cues would be instrumental in helping Mr. Dimodica. The scripts are the cognitive framework for someone like Mr. Dimodica who has problems integrating strategies into his everyday living. Repeated exposure helps increase long-term memory and learning for Mr. Dimodica. It is believed that the behavioral scripts as a cognitive framework will serve Mr. Dimodica in a way that real exposure does not.

In dialogue with the Life Links, Inc. Program that provides treatment for individuals with developmental disabilities who have a history of sexually inappropriate behavior, it was felt that the most effective treatment strategies that have been used are composed of three essential elements. They are:

1.  External controls. This containment model, due to the potential risks that Mr. Dimodica's behaviors, presents concern to the staff that someone like Mr. Dimodica would act out in the community. Therefore, staffing in these models is remarkably strict and there is twenty-four hours a day/seven days a week supervision in all social settings. If an individual like Mr. Dimodica is to be out in the community, he would be with a one-to-one staff person and always in line of sight supervision. If at one point Mr. Dimodica is able to have more independence in the community, this would be done in a graded exposure model specifically designed for Mr. Dimodica.

2.  An internal control plan would be utilized for Mr. Dimodica. These treatment outcomes would depend on the working of his own personal controls on his thoughts, feelings and behaviors. An additional component is the relapse prevention and one that is utilized at Life Links. This is what's called a Decision-Making Team (DMT). This is developed for each individual. This team includes the individuals (Mr. Dimodica, for example), the program manager, the designated clinician and the direct care staff member chosen by Mr. Dimodica. The function

of this team would not only be there to provide support and guidance, but would hold the individual accountable for any lapses, thoughts or actions that would affect his progress. Mr. Dimodica would meet with this team weekly and he would also have opportunities to confer with each staff person. A general communications book would be maintained by the staff which would serve as a personal record for his progress and would be reviewed weekly. The benefit of this program is that it can be implemented in a setting where there are numbers of individuals living in a residential program.

Treatment programs would also insure that Mr. Dimodica will have measurable outcomes which are paired with a loosely restricted environment which would insure safe and effective learning. It is this examiner's understanding that these would require the approval of Mr. Dimodica, a guardian, an agency peer review, the Human Rights Committee and the DMR Regional Peer Review prior to any implementation.

The components of a treatment plan that I think would work best for Mr. Dimodica would include specific work and target behaviors, what led to the type of victims he had, and what led to his offenses and his re-offending. They would also work on positive, oriented replacement behaviors.

3.      Treatment criteria would be measured and objective, and would determine specifically in a very graded task how Mr. Dimodica would demonstrate success and at the same time protect the community if he were to have more independence or freedom. There would be data collection and documentation. This would be done with his therapist and treatment staff as well as residential programming staff.

If Mr. Dimodica were to leave the Massachusetts Treatment Center, the model would be conceptualized similar to an after-care and recidivism prevention model that often takes place for mentally ill individuals who leave the hospitals or secure treatment facilities. A model that has been very effective in the community is the "*act model*" which is the assertive case management model. This model helps an individual deal with everyday issues in the community and work towards developing a system of supports to help motivate the individual and help maintain safety in the community as well as to free himself from relationships that promote pathological outcomes. For Mr. Dimodica, that would raise the question of improving his life by teaching practical

living skills as well as making sure that he is not involved with sexually dangerous individuals.

I believe that Mr. Dimodica would benefit from very intensive supervision to maintain stability in the community. Given that Mr. Dimodica has been in a Department of Correction facility for a very long time, it would be quite difficult, I believe, for him to manage the vicissitudes of everyday living. Close monitoring would be needed for Mr. Dimodica. He would be with a one-to-one staff person until he demonstrated healthful impulse control, healthful behavior, and an understanding and implementation of what relapse prevention treatment can do for him. He would best learn by repeated exposure, discussing positive self-statements, and learning about victim empathy. Though all these can be utilized in the treatment facilities, the difference, I believe, is that being in a DMR facility would be a pro-social rehabilitation program rather than a program under the Department of Correction. This model is more therapeutic than punitive. In addition, what would also seem to be therapeutic, I believe, would be the use of technology. For example, models that can be used would enable Mr. Dimodica, if he were able, to have some increased independence in the community and go off-grounds with a telephone or walkie-talkie where he can be in communication with staff that can provide support and feedback. This model is more balanced and would enable Mr. Dimodica to leave a secure treatment facility in a very graded fashion and, as noted above, have more independence while remaining safe and not placing members of the public in harm's way. With this type of exposure to the community, Mr. Dimodica would also have an opportunity to have frequent debriefings with staff of his experiences and how to modify his exposure to increase therapeutic benefit. This can occur in a program that DMR funds particularly with staffing ratios that are one-to-one. This is unlikely to occur in any other secure treatment facility – hospital or prison. Though there is no guarantee that this is precisely what will happen, my experiences and understanding of programs that DMR will fund replicate this model.

Respectfully submitted,

Paul D. Zeizel, Psy.D., Licensed Psychologist